# EXHIBIT 2 - REDACTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE STEERING COMMITTEE ON BEHALF OF THE PARTIES TO THE JPCIA DATED JULY 7, 2026,<br><br>Plaintiff,<br><br>-against-<br><br>PENINSULA CAPITAL TRUST, PENINSULA ACCUMULATOR TRUST, PENINSULA ACCELERATOR TRUST, MANHATTAN PRIVATE CREDIT MARKETS LLC, MANHATTAN ST NOTES LLC, MANHATTAN 5 OCEANS PARTNERS LLC, SAVILLE FIDUCIARY CORPORATION f/k/a GLOBAL PATENT & ASSERTION CAPITAL CORPORATION, DIGITANWORKS AG, DOVERA CAPITAL PTY LTD, RODGERS AND ASSOCIATES LLC, PERSHING INSURANCE BOND, LLC a/k/a PERSHING SPECIALTY RISK LLC, CROWN GLOBAL DMCC, MANHATTAN PRIVATE CREDIT (SEYCHELLES), BRAYDEN CRAIG a/k/a NOEL LUXETON a/k/a SCOTT CAMPBELL FISHER a/k/a NOEL AVASONIS a/k/a SEAN CARTIER a/k/a BENNET BRAYDEN RICHARDS a/k/a TRENT SCOTT WALLACE STRONG a/k/a SCOTT WILLIAMS, CAROL ANN HUNTER, TIM BENTLEY, ANDREW MACKENZIE MELVILLE a/k/a ANDREW MELVILLE, JENNIFER LYNN RODGERS a/k/a JENNIFER ROGERS, DANIEL BENZ, LUKE ADEBIYI, and NIGEL CATT,<br><br>Defendants. | Index No. 1:26-cv-7519 (MKV)<br><br>**AFFIRMATION OF NEAL H. LEVIN IN SUPPORT OF PLAINTIFF'S *EX PARTE* EMERGENCY MOTION TO MODIFY TRO ORDER AND FOR APPOINTMENT OF ESCROW AGENT** |

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

NEAL H. LEVIN, ESQ., pursuant to 28 U.S.C. § 1746 and under penalty of perjury, affirms as follows:

1. I am a partner at Rimôn P.C., Chair of the Global Fraud, Investigations and Asset Recovery Team, and Head of the Internal Investigations Unit. I am counsel to Plaintiff THE STEERING COMMITTEE ON BEHALF OF THE PARTIES TO THE JPCIA DATED JULY 7, 2026 (the "Plaintiff" or "MPCM Investors"). I submit this Affirmation based upon my personal knowledge, my firm's investigation, records obtained in that investigation, and communications in which I participated or that I reviewed in the ordinary course of representing Plaintiff.

2. On September 3, 2026, the Court entered an Order granting a Temporary Restraining Order, a Pre-Judgment Order of Attachment, and expedited discovery (ECF No. 5) (the "September 3 Order"). The Court found, among other things, that Plaintiff was likely to succeed on the merits, that the pleadings described a sophisticated scheme capable of dispersing allegedly fraudulently obtained funds, and that Plaintiff was likely to suffer irreparable harm absent immediate relief.

3. On September 17, 2026, the Court modified and extended the September 3 Order. Plaintiff now seeks limited additional relief to preserve roughly US $12,000,000.00 in cash that Plaintiff's counsel has recently discovered traced directly to MPCM Investors investment. Accordingly, Plaintiff seeks an order modifying the existing restraint and attachment to specifically include these funds within the Temporary Restraining and Attachment Orders and appointing an Escrow Agent, solely to receive, preserve, account for, and hold those funds subject to further order of the Court.

4. Between October 2024 and July 2026, MPCM Investors invested approximately US $250,000,000.00 with or through certain of the Defendant entities. The MPCM Investors were told that their funds would be placed in legitimate and secure investment vehicles, though they were not. [redacted]

5. The investigation further indicates that these investor funds flowed from Defendant Manhattan ST Notes LC ("MSTN") to Manhattan Private Credit Markets LLC ("MPCM") [redacted]

6. The timing of these transfers is significant. [redacted]

7. Based upon information gathered and provided by individuals as part of Plaintiff's investigation, including [redacted]

8. [redacted]

9. The documentary record also confirms that [redacted]

10. [redacted]

11. [redacted]

12. [redacted]

13. Because [redacted], appointment of an escrow agent is necessary to take possession of the funds. The escrow agent's authority can be narrowly confined to accepting the remittance, establishing a segregated interest-bearing account, maintaining the funds without distribution, providing statements or reports as directed by the Court, and complying with further orders concerning the funds.

14. This requested relief would not determine ultimate ownership, lien priority, tracing, setoff, allocation, or entitlement to distribution. It would preserve the *status quo* and prevent the identified funds from being returned to MSTN, MPCM, their controllers, or any other person aligned with Defendants before the Court can adjudicate the parties' rights.

15. The need for a neutral recipient is immediate. MSTN and MPCM have been served with the Summons, Complaint, September 3 Order, and supporting motion papers, but have not appeared. *See* Affidavit of Service on MSTN at ECF No. 24; Affidavit of Service on MPCM at ECF No. 25. Returning

the identified funds to entities whose principals have not appeared and whose alleged conduct prompted the existing restraint would expose the funds to the precise risk of dissipation and concealment that the September 3 and September 17 Orders was intended to prevent.

16. An escrow agent would be substantially less intrusive than a general receivership. The escrow agent would not operate any business, adjudicate claims, make distributions, or exercise general control over any Defendant. The escrow agent would serve only as a neutral, Court-supervised custodian for the identified [redacted] funds.

17. Plaintiff therefore respectfully requests that the Court modify the September 3 Order, as previously extended and modified on September 17, to appoint an escrow agent to receive directly from [redacted] the remaining investor funds, presently identified as [redacted]; maintain them in a segregated, interest-bearing account in custodia legis; prohibit any withdrawal, transfer, encumbrance, pledge, distribution, offset, or other disposition absent further order; and provide such reporting as the Court directs.

18. To effectuate this relief, Plaintiff's submit that Verita Trustee and Fiduciary Services as Escrow Agent. Their experience and skill set ae well-suited for this appointment. I have known Verita to be competent and skilled (see Verita services pamphlet attached hereto as **Exhibit 1**). I have further reviewed the terms of the engagement (see Fund Services Agreement attached hereto as **Exhibit 2**) and believe them reasonable.

19. No prior application has been made for the precise relief requested herein, except that Plaintiff's prior applications sought and obtained the existing temporary restraint, attachment, and related asset-preservation relief.

Dated: New York, New York
September 21, 2026

/s/Neal H. Levin
Neal H. Levin

# EXHIBIT 1

# Verita TFS Services

verita

# The Verita Difference

## Our Team

We will leverage the knowledge and experience of key personnel who will be directly involved in this engagement and have expertise managing and administering similar matters. Biographies of select key personnel can be found in Appendix A.

## Distribution & Banking Overview

Verita distributes on average 4.5+ million payments totaling $2.4 billion per year.

On administrations that require disbursements to be made by Verita, and upon instruction from our clients, we immediately establish a dedicated and case-specific checking account. All accounts are opened with an FDIC-insured domestic financial institution.

Verita's Fund Accounting department reconciles each distribution by checking the account on a daily basis.

Verita will not make any fund payments or distributions without prior approval from our client. All proposed transfers of funds to or from accounts will be performed in accordance with client policy and/or court or administrative order and are subject to prior written approval from the client. These include transfers for payment of invoices for work.

## Strong Banking Relationships

A key element of success is a strong working relationship with an established banking partner that we work closely with across a multitude of government cases for the DOJ and SEC. We leverage our long-standing bank relationships and the seamless integration of our payment platform. This well-established process provides a strong advantage in the time and effort necessary to issue 900+ domestic and international wires while limiting the human intervention of sensitive data. The uploading of wire instructions, multi-factor dual approval requirements, integrated OFAC reviews and tracking of reference numbers for each individual wire provides assurance to the integrity of the process and increases the success of the payment execution.

## Insurance

Verita's $50 million Professional Indemnity insurance covers any claim arising out of wrongful professional acts. Verita's Comprehensive Crime/Electronic & Computer Crime Insurance covers losses sustained because of infidelity of employees, loss on premises, in transit, forgery or alteration, electronic and computer crimes, and other fraudulent activities.

## Relevant Case Experience

Verita, one of the first firms in the administration industry, has handled administrations and distribution services for nearly 40 years, including matters before every United States District Court, trial courts of nearly every state and numerous large Receiver matters. Our experience includes several of the largest and most complex matters in history, with distributions of funds as large as $7 billion. Because our systems are designed to be flexible and scalable, we can bring the same high degree of quality assurance and oversight to every case, large or small. Our staff has provided sworn testimony in thousands of matters, and they have regularly appeared before supervising courts to provide reports and testimony.

***U.S. Receiver Stanford Financial claims***

- Most recently issuing $1+ Billion to thousands of harmed investors in November of 2024 via wire and check across the globe with a large volume of payments in Latin America
- 10+ year administration servicing a multitude of ongoing Stanford related litigations and periodic distributions across tens of thousands of harmed investors throughout each year

Additional SEC Receivership matters Verita has administered include:

- Profit Connect, SEC Receivership
- CapSource, SEC Receivership
- Automators LLC, FTC Receivership
- CryptoFX, LLC, SEC Receivership
- Aequitas Management LLC, SEC Receivership
- TCA Fund Management Group Corp, SEC Receivership

*See Appendix B - For additional details on Verita's Specialty Fund Accounts & Disbursement Services.*

# Appendix A



# Rebecca DeGroot


**Executive Vice President**

(310) 220-9325
rdegroot@veritaglobal.com


## As an Executive Vice President of Corporate Restructuring and Trustee & Fiduciary Services (TFS), Rebecca brings two decades of industry experience to the Verita team.

Rebecca leverages her broad range of expertise in consumer and corporate bankruptcy matters coupled with specialty fund and depository services to partner with clients seeking fiduciary administration services. She manages the TFS Business Development team along with her key client relationships and facilitates the growth of new client engagements. Prior to Verita, Rebecca worked as the National Account Executive for a software and fiduciary services provider.

Rebecca is an Ambassador board member of the National Association of Bankruptcy Trustees (NABT). She is a member of the Turnaround Management Association (TMA), National Association of Federal Equity Receivers (NAFER), California Receiver's Forum (CRF), Commercial Receiver's Association (CRA), INSOL International, American Bankruptcy Institute (ABI), International Women's Insolvency Restructuring Confederation (IWIRC) and Association of Insolvency & Restructuring Advisors (AIRA). In addition, Rebecca serves on several committees with NABT and NAFER.



# Lara McDermott


## Executive Vice President

415.200.6968
lara.mcdermott@veritaglobal.com


**Lara brings two decades of experience to her role as Executive Vice President of Settlement Fund Accounting, where she is responsible for strategic growth and guidance in settlement fund accounting, banking, distributions, and tax compliance.**

In the last ten years, Lara and her team have overseen the distribution of more than 7,700 class distributions, representing over 31 million payments and more than $17 Billion in assets. In recent years, $4 billion of these monies have been distributed in EUR, CAD, ZAR in support of collective actions and non-US settlements. As the marketplace for digital disbursements continues to grow, this team has helped facilitate more than 100+ digital distributions to more than 3 million claimants via PayPal, Venmo, Zello, Amazon and Interac.

Prior to joining Verita, Lara specialized in public accounting for over a decade, serving as an audit manager for PricewaterhouseCoopers in the Financial Services sector based in San Francisco, Singapore and New York. Throughout her years of experience in settlement administration, Lara has overseen more than 2,600 settlement administrations, which have included some of the largest and most complex private settlements in history: Enron, UnitedHealth, Facebook, Pfizer, and Fortis (Europe).

Lara graduated from the University of California, Santa Barbara with a Bachelor of Arts in Business Economics and Psychology, and holds a Masters of Applied Finance from Macquarie University, Australia, as well as a Certified Treasury Professional Certificate and a California C.P.A. License.

# Appendix B

# Specialty Fund Accounts & Disbursement Services

## We're using cutting-edge technology to manage your chapter 11 funds.

At Verita, we're always looking for new ways to streamline your case's day-to-day operations. That's why we developed a UST-compliant, end-to-end software platform capable of managing the estate's funds during all stages of your chapter 11 matter. Every step of the way, we're committed to shrinking the administrative burden, so you can stay focused on the big picture.

### Experience the Verita difference.

#### Superior Banking to Save You Time

Verita offers a robust network of UST-approved banking options across all time zones; more than any other provider in the industry. Save time with same-day bank account opening and funding regardless of KYC completion and further experience a rapid turnaround time of just one week on average, from start to finish of the KYC process.

#### Fund Account Services

Verita is set up to provide collateralization of funds and secure investment options no matter the size of the deposit or term, making us the true end-to-end ally for better fiduciary support services.

#### Our Unique Expertise

Verita's subject matter experts support all varieties of specialty tax reporting, including complex wage claims disbursements, and IRS form preparation and reporting. When it comes to foreign disbursements, Verita fully understands the unique concerns surrounding international currency payments for cases of all sizes.

### Trust Verita for:

- Pre-Petition Accounts
- DIP Accounts
- 363 Sale Escrows
- Professional Fee Escrows
- DACA's
- Disbursing Agent Accounts
- Distribution Accounts
- Wind Down Accounts with Plan Administrators
- Litigation Trusts
- Liquidating Trusts
- Sub-Chapter V
- State and Federal Receiverships
- Assignment for the Benefit of Creditors (ABC's)
- Partition Referee Accounts

## Your Verita Team



**Rebecca DeGroot**
Executive Vice President
310.220.9325
rdegroot@veritaglobal.com



**Michelle Salazar Rosenbloom**
Senior Managing Director
310.341.8980
msalazar-rosenbloom@veritaglobal.com



**Albert H. Kass**
Senior Executive Vice President
310.367.2313
akass@veritaglobal.com

# EXHIBIT 2

# FUND SERVICES AGREEMENT

This Agreement is entered into as of _______________, 2026, between ________ ("Client") and Verita Global, LLC (together with its affiliates, "Verita").

In consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1. SERVICES**. Verita agrees to provide Client with account set-up, fund services and such other services as may be agreed by the parties in writing and as listed on Exhibit A (the "Services"). Client acknowledges and agrees that Verita will often take direction from Client's representatives, employees, agents and/or professionals (collectively, the "Client Parties") with respect to the Services. The parties agree that Verita may rely upon, and Client agrees to be bound by, any requests, advice or information provided by the Client Parties to the same extent as if such requests, advice or information were provided by Client. Client agrees and understands that Verita shall not provide Client or any other party with any legal advice.

**2. PRICES, CHARGES AND PAYMENT**. Verita agrees to charge and the Client agrees to pay Verita the fees and charges set forth in Exhibit B for the Services. Verita's prices are generally adjusted periodically to reflect changes in the business and economic environment and are inclusive of all charges. If any price increase exceeds 10%, Verita will give thirty (30) days written notice to the Client. Client acknowledges that any estimate that may be provided by Verita is based on information provided by Client to Verita and actual fees and expenses may vary depending on the circumstances of the additional services to be provided. Client agrees to pay the reasonable, pre-approved charges incurred by Verita in connection with Services, including, but not limited to, transportation, lodging, meals.

Verita agrees to submit its invoices to Client and Client agrees that the amount invoiced is due and payable upon receipt. If any amount is unpaid as of thirty (30) days from the receipt of the invoice, the Client further agrees to pay a late charge (the "Finance Charge"), calculated as two and one-half percent (2-1/2%) of the total amount unpaid every thirty (30) days. In the case of a dispute in the invoice amount, Client shall give written notice to Verita within twenty (20) days of receipt of the invoice by Client.

**3. FURTHER ASSURANCES**. To the extent applicable, Client agrees that it will use its best efforts to include provisions reasonably acceptable to Verita in any relevant court order, settlement agreement or similar document that provide for the payment of Verita's fees and expenses hereunder.

**4. RIGHTS OF OWNERSHIP**. The parties understand that the software programs and other materials furnished by Verita to Client and/or developed during the course of the performance of Services are the sole property of Verita. The term "program" shall include, without limitation, data processing programs, specifications, applications, routines, and documentation. Client agrees not to copy or permit others to copy the source code from the support software or any other programs or materials furnished to Client. Fees and expenses paid by Client do not vest in Client any rights in such property, it being understood that such property is only being made available for Client's use during and in connection with the Services provided by Verita.

**5. CONFIDENTIALITY**. Each of Verita and Client, on behalf of themselves and their respective employees, agents, professionals and representatives, agrees to keep confidential all non-public records, systems, procedures, software and other information received from the other party in connection with the Services; provided, however, that if either party reasonably believes that it is required to produce any such information by order of any governmental agency or other regulatory body it may, upon not less than five (5) business days' written notice to the other party, release the required information. These provisions shall survive termination of Services.

6. **ARTIFICIAL INTELLIGENCE (AI)**. Verita may use AI-assisted tools solely to support service delivery (e.g., data processing, fraud detection, communications). Such tools do not independently make decisions affecting individuals. Personal information processed via such tools is subject to the same contractual restrictions, security measures, and data protection obligations as all other processing, and is not used to train shared or third-party AI models.

**7. BANK ACCOUNTS**. Verita shall be authorized to establish accounts with financial institutions as agent for Client or as otherwise agreed by the parties in the performance of the Services (each, an "Account"). All Accounts established under this Agreement shall be deposit accounts with commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.). These shall be deemed to have been opened at the direction of the Client. Verita may from time to time receive interest, dividends or other earnings in connection with such deposits or investments as compensation for services provided under this agreement.

Client acknowledges that the Account will be held and maintained by Verita as agent for Client. The amounts held in the Account, once transferred into the Account, are held at the sole risk of Client.

Client acknowledges that if it requests to terminate an Account on less than seven days prior written notice of the expected Account funding date it will be charged a break-up fee equal to 25 basis points.

Client shall remain responsible for tax reporting. Verita, on behalf of Client, shall undertake only those tax reporting and withholding services as are reasonably requested by Client in writing. Any such tax related services shall be solely at the direction of Client and Verita may rely on the direction of the Company.

Verita shall make disbursements from an Account upon written direction of the Client. Verita shall have no obligation to follow any direction unless and until Verita is satisfied, in its sole discretion, that the persons executing the direction are authorized to do so. If any amount to be released at any time or under any circumstances exceeds the balance in the Account, Verita will advise of the deficiency in writing, and if the instruction to release is re-confirmed in writing, Verita shall release the balance in the Account and shall have no liability or responsibility for any deficiency. Verita may rely upon and shall not be liable for acting or refraining from acting upon any written notice, court order, document, instruction or request furnished to it by Client, without being required to determine the authenticity or validity thereof or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgment or order. Verita may act in reliance upon any signature believed by it to be genuine and may assume that such person has been properly authorized to do so by Client.

In the event an Account holds funds related to a case under chapter 11 of the United States Bankruptcy Code at the time of confirmation of a plan, Client will be charged a transfer fee of 25 basis points for any Account funds transferred to a non-Verita partner bank post-confirmation.

**8. TERMINATION**. The Services may be terminated by either party (i) upon thirty (30) days' written notice to the other party or (ii) immediately upon written notice for Cause (defined herein). As used herein, the term "Cause" means (i) gross negligence or willful misconduct of Verita that causes serious and material harm to Client, (ii) the failure of Client to pay Verita invoices for more than sixty (60) days from the date of invoice, or (iii) the accrual of invoices or unpaid services where Verita reasonably believes it will not be paid. Termination of Services shall not relieve Client of its obligations to pay all fees and expenses incurred prior to such termination.

In the event that the Services are terminated, regardless of the reason for such termination, Verita shall reasonably coordinate with Client to maintain an orderly transfer of funds held in an Account, data, programs, storage media or other materials furnished by Client to Verita or received by Verita in connection with the Services. Client agrees to pay for such services in accordance with Verita's then existing prices for such services.

**9. LIMITATIONS OF LIABILITY AND INDEMNIFICATION**. Client shall indemnify and hold Verita, its affiliates, members, directors, officers, employees, consultants, subcontractors and agents (collectively, the "Indemnified Parties") harmless, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, judgments, liabilities and expenses (including reasonable counsel fees and expenses) (collectively, "Losses") resulting from, arising out of or related to Verita's performance of Services. Such indemnification shall exclude Losses resulting from Verita's gross negligence or willful misconduct. Without limiting the generality of the foregoing, Losses include any liabilities resulting from claims by any third-parties against any Indemnified Party. Client shall notify Verita in writing promptly upon the assertion, threat or commencement of any claim, action, investigation or proceeding that Client becomes aware of with respect to the Services provided by Verita.

Except as provided herein, Verita's liability to Client or any person making a claim through or under Client for any Losses of any kind, even if Verita has been advised of the possibility of such Losses, whether direct or indirect and unless due to gross negligence or willful misconduct of Verita, shall be limited to the greater of (i) the total amount billed to Client and paid to Verita for the Services and (ii) solely in the event of any loss of the Amount Held caused by Verita's gross negligence or willful misconduct, the total Amount Held under Section 6. Other than indemnification obligations in this Agreement, in no event shall Client or Verita be liable for any indirect, special or consequential damages such as loss of anticipated profits or other economic loss in connection with or arising out of the Services. Client agrees that except as expressly set forth herein,

Verita makes no representations or warranties, express or implied, including, but not limited to, any implied or express warranty of merchantability, fitness or adequacy for a particular purpose or use, quality, productiveness or capacity. The provisions of this Section 8 shall survive termination of Services.

**10. FORCE MAJEURE**. Verita will not be liable for any delay or failure in performance when such delay or failure arises from circumstances beyond its reasonable control, including without limitation acts of God, acts of government in its sovereign or contractual capacity, acts of public enemy or terrorists, acts of civil or military authority, war, riots, civil strife, terrorism, blockades, sabotage, rationing, embargoes, epidemics, pandemics, outbreaks of infectious diseases or any other public health crises, earthquakes, fire, flood, other natural disaster, quarantine or any other employee restrictions, power shortages or failures, utility or communication failure or delays, labor disputes, strikes, or shortages, supply shortages, equipment failures, or software malfunctions.

**11. INDEPENDENT CONTRACTORS**. Verita is and shall be an independent contractor of Client and no agency, partnership, joint venture or employment relationship shall arise, directly or indirectly, as a result of the Services or these Terms and Conditions.

**12. NOTICES**. All notices and requests hereunder shall be given or made upon the respective parties in writing and shall be deemed as given as of the third day following the day it is deposited in the U.S. Mail, postage pre-paid or on the day it is given if sent by facsimile or on the day after the day it is sent if sent by overnight courier to the appropriate address set forth in the Proposal or to such other address as the party to receive the notice or request so designates by written notice to the other.

**13. APPLICABLE LAW**. These Terms and Conditions will be governed by and construed in accordance with the laws of the State of California, without giving effect to any choice of law principles.

**14. ENTIRE AGREEMENT; MODIFICATIONS; SEVERABILITY; BINDING EFFECT**. This Agreement constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof. If any provision herein shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby. This Agreement may be modified only by a written instrument duly executed by the parties. All of the terms, agreements, covenants, representations, warranties and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the parties and their respective successors and permitted assigns.

verita

**VERITA GLOBAL, LLC**

________________________________________________
BY: Rebecca DeGroot
TITLE: EVP, Corporate Restructuring Services and Trustee Fiduciary Services

**CLIENT**

________________________________________________
BY:
TITLE:

**AUTHORIZED REPRESENTATIVE FOR WIRE CONFIRMATIONS**

NAME: __________________________________________

FIRM: __________________________________________

TITLE: __________________________________________

TELEPHONE NUMBER: ______________________________

EMAIL: __________________________________________

## EXHIBIT A

***Fund and Distribution Services***

- Account set-up, reporting and account reconciliation
- Review and format disbursement data provided by Client
- 1099 Tax reporting and TIN collection services (only if specified by Client and agreed by Verita in writing)
- Additional services as requested by Client and agreed by Verita in writing
- All services subject to the standard fees and charges (*e.g.*, hourly consulting fees, printing charges, *etc.*)

## EXHIBIT B

***Fee Structure***

| **Consulting Services & Rates**[1] | |
|---|---|
| Position | Hourly Rate |
| Analyst/Consultant/Senior Consultant/Director | $40 - $195 |

Fund and Distribution Services[2]
**FBO (for benefit of) UST-Approved Bank Option**: Bank of America

| **Service** | **Fee** |
|---|---|
| XX Basis Points per annum[3] | |
| Escrow Fee Per Bidder | $1,500 |
| One Time Account Set up and Maintenance Fee | $1,500 |
| Escrow Fee Per Firm/Professional | $300 |

Fiduciary Administration Services[4]
**Standalone UST-Approved Bank Options**: Flagstar Bank, Western Alliance, East West Bank, Webster Bank

| **Service** | **Fee** |
|---|---|
| Monthly Bank Fees | Waived |
| Wire/Transfer Fees | Waived |
| Unlimited Transactions | No fees |
| No Minimum Balance | |
| No Withdrawal Penalty | |

Check Disbursement

| **Service** | **Fee** |
|---|---|
| Check Fee (Printing & Postage Only) | $5.00/check |

1099 Disbursement

| **Service** | **Fee** |
|---|---|
| 1099 Fee (Printing& Postage Only) | $2.75/1099 |
| 1099 Tax Reporting | Pricing upon request |

W-9 Mailing

| **Service** | **Fee** |
|---|---|
| W-9 Fee (Printing & Postage Only) | $2.75/W-9 |

[1] Please note that additional professional services not covered by this proposal will be charged at hourly rates, including any outsourced services performed under our supervision and control.
[2] Fees and charges are subject to increase based on market conditions, including the addition of bank fees. Verita will provide prior written notice of the effective date of any such increase or addition.
[3] Basis points are subject to change based on interest rate fluctuations.
[4] Fees and charges are subject to increase based on market conditions, including the addition of bank fees. Verita will provide prior written notice of the effective date of any such increase or addition.