UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE STEERING COMMITTEE ON BEHALF OF THE PARTIES TO THE JPCIA DATED JULY 7, 2026,<br><br>Plaintiffs,<br><br>-against-<br><br>PENINSULA CAPITAL TRUST f/k/a PENINSULA ACCUMULATOR TRUST, PENINSULA ACCELERATOR TRUST, MANHATTAN PRIVATE CREDIT MARKETS LLC, MANHATTAN ST NOTES LLC, MANHATTAN 5 OCEANS PARTNERS LLC, SAVILLE FIDUCIARY CORPORATION f/k/a GLOBAL PATENT & ASSERTION CAPITAL CORPORATION, DIGITANWORKS AG, DOVERA CAPITAL PTY LTD, RODGERS AND ASSOCIATES LLC, PERSHING SPECIALTY RISK LLC, a/k/a PERSHING INSURANCE BOND, CROWN GLOBAL DMCC, MANHATTAN PRIVATE NETWORK LTD., BRAYDEN CRAIG a/k/a NOEL LUXETON a/k/a SCOTT CAMPBELL FISHER a/k/a NOEL AVASONIS a/k/a SEAN CARTIER a/k/a BENNET BRAYDEN RICHARDS a/k/a TRENT SCOTT WALLACE STRONG a/k/a SCOTT WILLIAMS, CAROL ANN HUNTER, TIM BENTLEY, ANDREW MACKENZIE MELVILLE a/k/a ANDREW MELVILLE, JENNIFER LYNN RODGERS a/k/a JENNIFER ROGERS, DANIEL BENZ, LUKE ADEBIYI, and NIGEL CATT,<br><br>Defendants. | Index No. 1:26-cv-07519<br><br>**VERIFIED**<br>**<u>COMPLAINT</u>**<br>**Jury Trial Demanded** |

Plaintiff THE STEERING COMMITTEE ON BEHALF OF THE PARTIES TO THE JPCIA DATED JULY 7, 2026 ("Plaintiffs" or "MPCM Investors"), by their attorneys Rimôn P.C., for their complaint against defendants PENINSULA CAPITAL TRUST f/k/a PENINSULA

ACCUMULATOR TRUST, PENINSULA ACCELERATOR TRUST, MANHATTAN PRIVATE CREDIT MARKETS LLC, MANHATTAN ST NOTES LLC, MANHATTAN 5 OCEANS PARTNERS LLC, SAVILLE FIDUCIARY CORPORATION f/k/a GLOBAL PATENT & ASSERTION CAPITAL CORPORATION, DIGITANWORKS AG, DOVERA CAPITAL PTY LTD, RODGERS AND ASSOCIATES LLC, PERSHING INSURANCE BOND, LLC a/k/a PERSHING SPECIALTY RISK LLC, CROWN GLOBAL DMCC, MANHATTAN PRIVATE NETWORK LTD., BRAYDEN CRAIG a/k/a NOEL LUXETON a/k/a SCOTT CAMPBELL FISHER a/k/a NOEL AVASONIS a/k/a SEAN CARTIER a/k/a BENNET BRAYDEN RICHARDS a/k/a TRENT SCOTT WALLACE STRONG a/k/a SCOTT WILLIAMS, CAROL ANN HUNTER, TIM BENTLEY, ANDREW MACKENZIE MELVILLE a/k/a ANDREW MELVILLE, JENNIFER LYNN RODGERS a/k/a JENNIFER ROGERS, DANIEL BENZ, LUKE ADEBIYI, and NIGEL CATT (collectively, "Defendants"), upon knowledge as to Plaintiffs' own actions and upon information and belief as to the actions of all others, allege as follows:

## NATURE OF THE ACTION

1. This action is brought by Plaintiffs to recover no less than $105,892,547.02 that they invested with and through Defendants between October 2024 and July 2026. This action is brought on behalf of investors currently totaling 373 individuals who were victim of a phony investment scheme (the "MPCM Investors"). Individually, and in concert with one another, Defendants fraudulently represented to MPCM Investors, both orally and in writing, that their funds would be placed in legitimate, secure investment vehicles with returns made at specified times and that MPCM Investors would receive a timely return on investment for all of these funds, knowing that the funds would not be used for investment purposes as stated and that

MPCM Investors would thereby be deprived of their money. In total, 572 investments were made based upon Defendants' misconduct. As of the date of this filing, no less than 373 MPCM Investors have signed on to participate in this action.

2. Throughout MPCM Investors' relationship with Defendants, Defendants repeatedly assured the MPCM Investors that their investments were secure and would generate returns, even misrepresenting that the investments were protected by surety or insurance products that never existed, and regularly promised the MPCM Investors that payment was imminent.

3. However, while periodic payments were made to existing investors from newly invested money, as opposed to from revenue or profits of any legitimate business operation or activity, on or about June 25, 2026, the Defendants behind this massive fraud discontinued payments to investors, refused to respond to inquiries about the investments and shut-down the elaborate portal created by the Defendants that was used as an instrumentality of the fraud scheme and which MPCM Investors would access to monitor their investments. In short, the fraudsters packed-up and went home.

4. Certain of the Defendants had already and would thereafter create a web of deflection points, intentionally attempting to steer the MPCM Investors from the truth, furthering their deception and attempting to frustrate investigation and recovery efforts.

5. As a result, Plaintiffs are currently owed and have been damaged in an amount no less than $105,892,547.02 in capital investment, plus interest, costs and attorneys' fees.

## THE PARTIES

6. Plaintiff is a Steering Committee appointed by investors and agents pursuant to a Joint Prosecution and Common Interest Agreement with Steering Committee Mandate dated

July 7, 2026 (the "JPCIA") to coordinate the joint prosecution, investigation, litigation, recovery, asset preservation, settlement, communications, and strategic direction of claims arising from investments in Manhattan ST Notes LLC ("MSTN"), Manhattan Private Capital Markets LLC ("MPCM"), First Degree Asset Management, Six Senses Private Credit, Mosaic Capital ("Mosaic"), and Gipfel Capitale Insurance & Underwriting Partners ("Gipfel Capitale"). The Steering Committee has its principal place of business located at 10 Dyke Road Avenue, Brighton BN1 5LB, Brighton BN1 5LB, United Kingdom.

7. At all relevant times, defendant MANHATTAN PRIVATE CREDIT MARKETS LLC ("MPCM") was a New York domestic limited liability company formed on February 10, 2025, with a mailing address of 1501 Broadway, 12th Floor, New York, New York 10036, a virtual office address. MPCM also listed 14 Wall Street, 20th Floor, New York, New York 10005 as an address, a Regus virtual office at which 261 other businesses are located, and 108 Patriot Drive, Suite A, Middletown, Delaware 19709. MPCM holds itself out as a private credit and structured finance investment platform and markets and distributes structured notes issued by its affiliate, Manhattan ST Notes LLC. MPCM is the majority-in-interest owner of MSTN. MPCM's domain manhattanpcm.com was registered on August 15, 2025, behind WHOIS registrant information on Singapore-based hosting, belying the claimed operating history.

8. Manhattan 5 Oceans Partners LLC was identified as the predecessor operational entity, with MPCM being the entity operating after approximately February 2025. Critically, banking discovery has indicated that the primary banking conduits through which investors paid into scheme was into accounts held in the names of MSTN (over $175 million in various currencies), Peninsula Accumulator Trust (over $22.5 million) and Peninsula Capital Trust (over $42 million).

9. At all relevant times, defendant MANHATTAN ST NOTES LLC ("MSTN") was a Delaware limited liability company (Entity ID No. 4137025) formed on July 3, 2024, with a registered agent address of Corp1, Inc., 614 N Dupont Highway, Suite 210, Dover, Delaware 19901, and an operating address, shared with MPCM, at 1501 Broadway, 12th Floor, New York, New York 10036. MSTN also has a registered agent at Corp1, Inc., 614 N Dupont Highway, Suite 210, Dover, Delaware 19901. MSTN is the designated note-issuing entity for all of the investment products marketed under the MPCM platform, including those purchased by MPCM Investors. MSTN ceased to be in good standing as of June 1, 2026, owing $515 in franchise tax to the State of Delaware. Its Legal Entity Identifier (LEI 9845001YAAF588G8AB61) is deceptively displayed on the MPCM website as though it belongs to MPCM, misleading investors regarding the identity and regulatory status of the entity with which they transacted. TLO and Westlaw commercial database searches returned no principals, subsidiaries, or employees associated with MSTN.

10. Banking discovery established that MSTN was one of the primary issuers and a principal banking/fund-flow entity actually receiving or moving investor funds, in contrast to MPCM which functioned as the operating/management-facing entity. The investigation has shown that more than USD$120 million, GBP 24.5m, Euro 19.9m, CAD $4m, and AUD $6m flowed through the MSTN BMO account. Additionally, the Corpay production revealed a $5 million transfer on June 8, 2026 from the MSTN Corpay account to Manhattan Private Network Ltd.'s iFAST Global Bank account in the United Kingdom, described as "Subscription Platform Seed Funding," demonstrating direct financial connections between the U.S. and Seychelles operations.

11. At all relevant times, defendant BRAYDEN CRAIG a/k/a NOEL LUXETON a/k/a SCOTT CAMPBELL FISHER a/k/a NOEL AVASONIS a/k/a SEAN CARTIER a/k/a BENNET BRAYDEN RICHARDS a/k/a TRENT SCOTT WALLACE STRONG a/k/a SCOTT WILLIAMS ("Craig") was the alleged controller and reported head of Peninsula, who operated under these and other aliases in connection with the Manhattan and Peninsula entities. Under the alias Brayden Craig, he served as adviser to Peninsula Accelerator Trust and director of Surge Pricing Patent Holdings/"Surgetech." UK Companies House filings confirm that Craig was a documented director and 75% or greater majority shareholder of Kiribilli Private Capital Limited (a UK entity, since dissolved in 2019), with Noel Luxeton listed as secretary.[1] In 2004, he was convicted in connection with operating a $200,000,000.00 boiler-room fraud in Thailand, and in 2014 he was linked to a separate alleged Ponzi scheme involving approximately $130,000,000.00. Craig currently controls fund flows through a separate structure called Kirribilli Private Wealth. Upon information and belief, he resides in Panama.

12. At all relevant times, defendant PENINSULA CAPITAL TRUST f/k/a PENINSULA ACCUMULATOR TRUST ("Peninsula" or "Peninsula Accumulator") was a Delaware statutory trust declared by defendant Saville Fiduciary Corporation, as trustee, on August 1, 2021, with an address at 1000 N. West Street, Suite 1200, Wilmington, Delaware 19801.

13. On September 19, 2024, a certificate of amendment changed the trust's name from Peninsula Accumulator Trust to Peninsula Capital Trust, though the former name continued to be used on offerings and bank accounts after the name change. Peninsula Accumulator issued

[1] This is one example of Defendants taking majority control of undercapitalized entities and installing associates in officer positions.

the ParadigmX Series, 9M Converter Bonds, and A5-Plus Series, products that were later converted into Manhattan-branded notes which were also offered and sold to MPCM Investors. Peninsula's registered agent is The Corporation Trust Company, 1209 Orange St., Wilmington, DE, 19801, and Peninsula also listed as its principal place of business 104 West 40th Street, Floors 4 and 5, New York, New York 10018.

14. Banking discovery revealed that despite the name change effected in 2024, the Defendants continued to utilize the Peninsula Accumulator name well into 2025. Both Peninsula Accumulator Trust and Peninsula Capital Trust were named issuers and have bank accounts held in both respective names. Investor funds were run through Peninsula and MSTN accounts, with the MSTN BMO account appearing to be the principal account. Peninsula maintained multiple accounts at East West Bank in the name of Peninsula Accumulator Trust, including accounts ending x5730, x2641, x2642, and x2643. The investigation further over $22.5 million flowing through account x5730 between October 2024 and May 2026, and AUS 1.5 million flowing through account x2643 between March and May 2026, establishing that Peninsula Accumulator Trust accounts were a continuing, ongoing part of the operational money movement, not merely issuer/predecessor investment vehicles appearing in offering documents. Peninsula also maintained accounts in the name of Peninsula Capital Trust at BMO, including multiple sister accounts, distinguished by denomination, ending in x4809, through which more than USD $41.7 million and AUD $1 million flowed through between March 2025 and May 2026, also establishing that Peninsula Capital Trust accounts were a continuing, ongoing part of the operational money movement, not merely issuer/predecessor investment vehicles appearing in offering documents.

15. At all relevant times, defendant PENINSULA ACCELERATOR TRUST ("Peninsula Accelerator") was a Delaware trust that held approximately $3.31 million of AllotZ convertible notes and shared personnel, branding, and an investor pipeline with Peninsula Capital Trust and the broader Manhattan network.

16. At all relevant times, defendant MANHATTAN 5 OCEANS PARTNERS LLC ("M5OP") was a Delaware limited liability company formed on February 22, 2024, and with a registered agent at Corp1, Inc., 614 N Dupont Highway, Suite 210, Dover, Delaware 19901, which operated the original investor portal and email domains associated with Defendants and served as the operational link between the pre-2025 Manhattan brand and the post-2025 MSTN/MPCM structure.

17. At all relevant times, defendant SAVILLE FIDUCIARY CORPORATION, formerly known as Global Patent & Assertion Capital Corporation ("Saville"), was a Delaware corporation (File Number 4249665), incorporated November 25, 2020, with a registered agent at Corp1, Inc., 614 N Dupont Highway, Suite 210, Dover, Delaware 19901, the same registered agent as MSTN. Saville's name was changed from Global Patent & Assertion Capital Corporation to Saville Fiduciary Corporation by Certificate of Amendment filed March 26, 2025, signed by defendant Carol Ann Hunter ("Hunter") as President. On March 17, 2026, a subsequent Certificate of Amendment designated Pro Business Consulting LLC as owner, signed by Michal Petrovic. Saville served as Trustee of both Peninsula Accumulator Trust and Peninsula Capital Trust and as counter-signatory on the X-90 notes issued by Peninsula Capital Trust. On June 17, 2026, following the collapse of the scheme, Peninsula issued a Notice to

Investors redirecting all payments to Saville at JPMorgan Chase Bank, N.A.,[2] consistent with fund dissipation through an entity without demonstrated operational history.

18. At all relevant times, defendant DIGITANWORKS AG ("DigitanWorks") was a Swiss company based at Badenerstrasse 565a, 8048 Zürich, Switzerland, that served as the platform and technology provider underpinning the Manhattan and Peninsula investor-facing infrastructure, including control over investor records, logs, and portal access.

19. At all relevant times, defendant DOVERA CAPITAL PTY LTD ("Dovera") was an Australian private company, CAN 637 482 109 reportedly solely owned by Parrawood Pty Ltd, an Australian private company owned jointly by Nigel Catt (50%) and Karen Louise Catt (50%) that served as the original feeder entity from which investment products were transferred first to Peninsula and then to Manhattan, and of which defendant Carol Ann Hunter is reported to have served as General Manager. Upon information and belief, Dovera is or was located at Suite 10 North, 215 Bell Street, Preston, VIC 3072 Australia.

20. At all relevant times, defendant RODGERS AND ASSOCIATES LLC ("Rodgers and Associates") was a California limited liability company registered at 2929 Westminster Ave. #2121, Seal Beach, California 90740, of which defendant Jennifer Lynn Rodgers is the Chief Executive Officer, Manager, and sole Registered Agent, and through which Jennifer Lynn Rodgers submitted a UCC financing statement purporting to secure approximately $112 million in obligations against the Peninsula trust structure.

21. At all relevant times, defendant CAROL ANN HUNTER ("Hunter") was the Group Chief Executive Officer of MPCM and MSTN, the Director and President of Saville, and the General Manager of Dovera. Hunter is the only individual documented as spanning MPCM,

[2] Account No. xxxxxxx917, ABA 021000021.

MSTN the Peninsula trustee entity, and the Dovera predecessor entity, providing the strongest evidence of unity of interest across the enterprise. On June 12, 2026, Hunter issued a "Public Interest Statement" described as a resignation, audit notice, and preservation notice, in which she confirmed loss of platform access and identified specific individuals whose roles required clarification, while claiming that hidden persons controlled the practical operations while she served as the recorded public face. Even after the scheme unraveled, Hunter continued to hold herself out as CEO and owner of the Manhattan entities. Upon information and belief, on or about July 7, 2026, a temporary restraining order was issued against Hunter by the Delaware Chancery Court, in an action filed under case number 2026-0825-BWD, preventing Hunter from holding herself out as being connected with Saville and the Peninsula entities. 22. Upon information and belief, Hunter resides at 5 Rothwell Court, Epping, Victoria 3076, Australia.

23. At all relevant times, defendant TIM BENTLEY ("Bentley") was the Chief Operations Officer of MPCM, appointed approximately August 2025, and a signatory on Distribution Partner Agreements for MSTN products. Bentley directed operational personnel including Luke Adebiyi, Mark Swann, and Uday Singh on investor communications, payment timelines, and compliance processes. His CV on the Manhattan website claims, "over 25 years' experience in Investment Banking including RBC, CBA and Barclays, FI/ABS syndication," however third-party profiles describe a payments/treasury career at WorldFirst, Novatti, and OFX, not fixed-income syndication. Bentley resigned as COO on June 14, 2026, and thereafter deleted his LinkedIn profile and terminated his WhatsApp account. Upon information and belief, he resides in Sydney, Australia.

24. At all relevant times, defendant ANDREW MACKENZIE MELVILLE, also known as Andrew Melville ("Melville"), was the Chief Commercial Officer and Director of

Ambassador Program & Product at MPCM. Melville participated as a Manhattan representative in investor-facing due diligence presentations, introducing existing note holders to the principal of the litigation manager into whose strategies note proceeds were purportedly deployed, while explicitly deferring all Manhattan-specific questions regarding capital guarantees and insurance coverage to separate channels. Upon information and belief, despite there being no legitimate investments, Melville was paid millions of dollars in alleged commissions for the fraudulent investments. Upon information and belief, he resides in the United Kingdom or the United Arab Emirates.

25. At all relevant times, defendant JENNIFER LYNN RODGERS, also known as Jennifer Rogers ("Rodgers"), was the Chief Financial Officer of MSTN and the Chief Executive Officer, Manager, and sole Registered Agent of defendant Rodgers and Associates. Rodgers operated in a capacity involving payment processing, reconciliation, coupon records, and financial records. Rodgers served as authorized signatory ("Accountant") on both the 2024 and 2025 Delaware annual reports for Saville. Through Rodgers and Associates, Rodgers personally submitted UCC Financing Statement No. 2024 4542245, filed July 3, 2024, naming Peninsula Accumulator Trust as Debtor and Crown Global DMCC (Dubai, UAE) as Secured Party, purporting to secure approximately $112 million in Non-Recourse Litigation Case contracts.[3]

26. As the Chief Financial Officer of MSTN, MPCM and in the equivalent role, being the sole accountant of Saville and Peninsula, Rodgers had a fiduciary duty to monitor and control the finances of those entities. By the very nature of her position with the entities, Rodgers had access to and knowledge of the full inflow and outflow of funds for MSTN, MPCM, Saville and Peninsula. Upon information and belief, Rodgers reviewed and confirmed all payments

[3] Curiously, this took place thirteen months before MPCM was incorporated.

received by the Investors. All payments made by MSTN and Peninsula were routed through their InvestorDisplay portal as "fee notes". Those "fee notes" were internally approved they were then routed to Rodgers to effectuate. Upon information and belief, she resides at 2929 Westminster Ave., 2121, Seal Beach, California 90740.

27. At all relevant times, defendant DANIEL BENZ ("Benz") was the Managing Director and sole-signatory board member of DigitanWorks. Upon information and belief, he resides in Thailand, having previously resided in Zürich, Switzerland.

28. At all relevant times, defendant LUKE ADEBIYI ("Adebiyi") was the Chief Investor & Communications Officer and Director of Communications & Marketing at MPCM. Adebiyi served as the central operational coordinator for investor relations, onboarding, rollovers, and compliance functions, reporting directly to Bentley. He was a point of contact in multiple investor communications and onboarding workflows and had broad visibility across day-to-day investor-facing operations, including the processing of subscription agreements through which MPCM Investors invested their funds. Upon information and belief, he resides in Australia.

29. At all relevant times, defendant NIGEL CATT ("Catt") was the reported owner of Dovera, the original feeder entity at the top of the MPCM Investor chain. His contact email (nigel@doveracapital.com) appeared on early Peninsula Accumulator Trust receipts. Hunter's Public Interest Statement identified Catt as a person connected to an alleged "payment event, asserted benefit, non-cash consideration, investment recognition or related arrangement" requiring explanation, and stated that he "continued to work from or around the same office environment" as the Manhattan and Peninsula operations. Upon information and belief, he resides at 43 Kenmare Street, Watsonia, VIC 3087, Australia.

30. At all relevant times, defendant PERSHING SPECIALTY RISK LLC ("Pershing"), also known as Persing Insurance Bond, LLC, was a Delaware limited liability company, File No. 4137159 registered at 614 N. Dupont Highway, Suite 210, Dover, Delaware 19901, the same registered agent address as MSTN, at which 252 other corporations are located. Pershing was named as guarantor under the purported "Short Term Notes Insurance Bond" referenced in all Series 1AA investment certificates and as Secured Party in UCC Financing Statements filed July 3, 2024 and June 20, 2025. Pershing has no registration with the National Association of Insurance Commissioners, no state insurance department licensing in any jurisdiction, and no listing in the U.S. Treasury's Circular 570 of companies authorized to underwrite federal surety bonds.

31. At all relevant times, defendant CROWN GLOBAL DMCC ("Crown Global") was a Dubai, UAE entity named as Secured Party in UCC Financing Statement No. 2024 4542245, filed July 3, 2024, with collateral stated at approximately $112,000,000.00 in Non-Recourse Litigation Case contracts, naming Peninsula Accumulator Trust as Debtor. The UCC filing was submitted by Rodgers through Rodgers and Associates. Crown Global's role as a purported secured creditor holding $112,000,000.00 in collateral against the Peninsula trust structure raises substantial questions about fabricated collateral or nominee arrangements designed to place assets beyond the reach of defrauded MPCM Investors. Crown Global has no identifiable registration with the Dubai Multi Commodities Centre (DMCC) public register or the Dubai Department of Economy & Tourism. Upon information and belief, Crown Global is or was located at DMCC Business Center, Level No. 1, Dubai, BA398, UAE.

32. At all relevant times, defendant MANHATTAN PRIVATE NETWORK LTD. ("MPN" or "MPC Seychelles") was a Seychelles entity located at 306 Victoria House,

Seychelles, identified through bank statements received in response to a subpoena issued pursuant to Court Order dated September 3, 2026 (the "September 3 Order") (ECF Doc. No. 5). MPN maintains a UK account at iFAST Global Bank. The entity was incorporated approximately six months before its identification in September 2026.

33. On September 14, 2026, the Corpay production revealed a $5 million transfer on June 8, 2026 from the MSTN Corpay account to Manhattan Private Network Ltd.'s iFAST Global Bank account, described as "Subscription Platform Seed Funding." This documentary evidence established that the Seychelles operation went from a suspected successor/new platform to an identified legal entity with an identified bank account and a documented $5 million transfer directly from MSTN. The previously-used designation "Manhattan Private Credit (Seychelles)" in the GlobeNewswire press release dated April 2, 2026 was not the correct legal entity name. MPN's website (manhattanprivatecredit.com) explicitly disclaims securities, stating that "Membership does not represent an investment product, security, or financial instrument." As of August 2026, manhattanprivatecredit.com and vip.manhattanprivatecredit.com remained live websites as successor solicitation platforms during active investor litigation, raising the specter of ongoing fraud and new victims.

## JURISDICTION AND VENUE

34. This Court has jurisdiction over this matter under 28 U.S.C. § 1332, based on diversity of citizenship among the parties. The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

35. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, specifically, 15 U.S.C. § 77l(a)(1), 15 U.S.C. §78j(b), and 18 U.S.C. § 1964.

36. Venue is properly laid in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 139l(a)(2).

## FACTUAL BACKGROUND

37. Between 2021 and 2025, Defendants constructed an elaborate multi-entity investment fraud architecture spanning at least three Delaware trusts, multiple limited liability companies, and a network of offshore entities across the United States, the United Kingdom, Australia, Luxembourg, the Seychelles, the United Arab Emirates ("UAE"), Switzerland, and Singapore. This architecture was designed to create the appearance of a legitimate, well-capitalized investment platform while funneling investor funds through opaque, centrally controlled banking channels. The scheme operated through a three-stage feeder chain, Dovera to Peninsula to Manhattan, in which each successive entity absorbed the investor base of its predecessor, extended the maturity of investor obligations, and expanded the scope of fraudulent solicitation.

### The Creation of the Infrastructure to Perpetuate the Scheme

38. The earliest layer of this architecture was formed on August 1, 2021, when Saville, at the time operating under its prior name, Global Patent & Assertion Capital Corporation, declared the Peninsula Accumulator Trust as a Delaware statutory trust. Between 2021 and 2024, the Peninsula trusts issued a series of short-term debt instruments (ParadigmX 120-Day Series, 9M Converter Bonds, A5-Plus Series, and X-90 Class Notes) to investors recruited through Dovera and a network of distribution agents. Early investors in these Peninsula products received their promised returns in full, building confidence and trust in the products and issuers. As described below, this is a hallmark of Ponzi-type trust-building designed to induce larger and longer-term investments.

39. On February 22, 2024, M5OP was formed in Delaware to operate the original Manhattan investor portal (manhattan5op.com) and email domains, effectively establishing the Manhattan brand.

40. On July 3, 2024, MSTN was formed in Delaware as the designated note-issuing entity.[4]

41. On February 10, 2025, MPCM was formed in New York as the marketing and distribution platform.

42. Through this sequence of formations, Defendants created a layered corporate structure in which one entity (MSTN) issued the notes, a second entity (MPCM) marketed the notes, a third entity operated the platform on which the investments were made (M5OP), and the beneficial ownership of all remained entirely undisclosed.

43. The Manhattan and Peninsula entities operated as a single coordinated operation under common control. Both generated subscription agreements from the same DocuSign originator IP address (52.163.187.236). Both used the InvestorDisplay platform provided by DigitanWorks. Both listed the same phone number (332-233-4237) on investor-facing materials. Both directed subscription funds through BMO Bank N.A. at the same branch (320 South Canal Street, Chicago, Illinois 60606). Both shared overlapping personnel, including Hunter, Melville, Rodgers, and Craig.

[4] Notably, an alleged "Short Term Notes Insurance Bond dated as of July 1, 2024," naming Pershing as guarantor and referenced in every Series 1AA investment certificate issued to investors. Accordingly, this bond predates MSTN's legal existence by two days, which is legally impossible, absent ratification and a material indicium of backdating or fabrication of the purported principal-protection instrument central to Defendants' marketing.

44. MPCM's email domain (manhattanpcm.com) served as the identity layer across the entire operation: Hunter, Melville, and others used "@manhattanpcm.com" addresses.[5] In addition, multiple individuals utilized the same email addresses, such as ambassador@manhattanpcm.com, evidencing that public-facing personas were run by one team on shared infrastructure. In a recorded December 2025 call, Melville confirmed this unified operation, stating that he was "actually Manhattan and Peninsula."

**Solicitation of Investor Funds**

45. Having constructed this infrastructure, Defendants began soliciting investor funds in or about October 2024. The earliest confirmed investment in the record is a subscription for $305,000.00 on or about October 16–18, 2024. From that date forward, and accelerating through the first half of 2025, Defendants marketed a series of purportedly principal-protected structured investment products, including the Manhattan Series 1AA, ELITE Gold Series I–III, ELITE Diamond Series I–IV, ELITE Sovereign 95X and 95XX Series, ELITE Black Label Program Signature Series I, and ELITE Premier 300 Series I (collectively, the "MPCM Notes"), to MPCM Investors and other investors nationwide and internationally. All MPCM Notes were issued by MSTN and marketed through the MPCM platform. No MPCM Note was ever registered with the SEC or any state securities regulator.

46. Initially, from the Gold Series 888, starting on or about January 6, 2025, through the joint offering of ELITE Gold Series III and ELITE Diamond Series III offerings, concluding

---

[5] To further obfuscate the relationship between Manhattan and its distributors, @manhattanpcm.com email addresses were issued to several distributors who had agent access on the InvestorDisplay platform. This created confusion as to which individuals were directly affiliated with Manhattan, and which were merely distributors who utilized Manhattan email addresses to communicate with clients investing in the MSTN products.

on or about February 26, 2026 (with rollover investments continuing through on or about April 27, 2026), Defendants specifically represented that MPCM Investor funds were backed by an investment into First Degree Global Asset Management Pte. Ltd., managed through First Degree Fund VCC and Six Senses Private Credit (insured by Gipfel Capitale Insurance & Underwriting Partners ("Gipfel")), which would be further invested into Mosaic litigation asset vehicles.

47. With the introduction of the ELITE Diamond Series IV offering, on or about March 5, 2026, Defendants abandoned this specific downstream investment structure and instead represented that investments would be backed by a vague litany of unspecified asset classes, including "litigation assets," "aviation leasing credit," "South America private markets credit," and "digital assets/RWA tokenization." This represents a material change in the characterized investment structure that was not disclosed to existing MPCM Investors.

48. To induce MPCM Investors and other investors to part with their money, Defendants falsely described the MPCM Notes, both orally and in writing, as safe, secure, and legitimate investment vehicles offering 100% principal protection backed by surety bonds and steady returns of up to 17% in as little as 90 days. All products were marketed under Manhattan's "Multi-Tier Capital Protection" ("MTCP") framework, which purportedly included a Gipfel Capitale surety bond, First Degree Global Asset Management Fund backing, and a 100% principal protection guarantee. Each of these representations was materially false: the surety bond provider did not exist as a licensed insurer, the fund manager publicly denied any involvement, and the principal protection guarantee was backed by nothing.

49. Defendants further represented to MPCM Investors that they possessed expertise in structured finance and litigation-asset-backed lending, that the MPCM Notes were properly licensed and registered investment products, and that investor capital would be deployed into

revenue-generating litigation assets managed by Mosaic Global Capital through the Six Senses Private Credit vehicle in Singapore.

**Initial Investments into the Scheme**

50. The scheme operated as a Ponzi-type fraud wherein Defendants paid early investors in full while simultaneously soliciting new capital from an expanding investor base. Documented coupon payments on the Series 1AA product began as early as November 2024, when the earliest confirmed investor received a pro-rata payment of $1,423.33 on a $305,000.00 subscription, followed by monthly coupons of $3,050.00 (December 2024) and $3,151.67 (January 2025), with payments continuing through March 2026 across an expanding base of investors.

51. Multiple investor accounts confirm that their initial Peninsula investments matured successfully and were repaid, building confidence before larger investments were solicited and transferred to the Manhattan platform. At least one investor in the 1AA product reported multiple unauthorized reinvestments of a $305,000.00 (face amount) note without investor election starting in or about October of 2025, an action consistent with Ponzi liquidity management. Early "booster coupon" payments to Peninsula investors functioned as bait in this Ponzi scheme pattern.

52. Defendants marketed the MPCM Notes through a multi-tier distribution model, proceeding from the Issuer (MSTN) through the Executive Principals (Hunter, Bentley, Melville, Rodgers) a primary distributor, and sub-distributors (including Hays Mews Capital, SW1 Group, Wimbledon Wealth, WhiteKnight Wealth Management, and PMI Gateway, among others) and ultimately to MPCM Investors and other investors.

**Falsifying Records and Misrepresentations Made in Furtherance of the Scheme**

53. In furtherance of the scheme, Defendants fabricated documents, including a May 21, 2024, subscription agreement that identifies "DigitanWorks" as a party alongside MSTN, notwithstanding that the agreement predates MSTN's Certificate of Formation by approximately six weeks.

54. Defendants further represented that MPCM Investor principal was protected through insurance-backed guarantees and related collateral arrangements. Between May and October 2025, Defendants disseminated private placement memoranda, investment framework memoranda, series supplements, sales presentations, conversion agreements, deed certificates, and marketing emails that described the investments as secure, insured, and supported by a substantial track record of profitable lending activity.

55. Specifically, in or around March 24, 2025, Defendants presented MPCM Investors with a written Investment Certificate that stated the notes were issued pursuant to a "Short Term Notes Insurance Bond dated as of July 1, 2024," identified Pershing as guarantor, and described the investment as entitled to the protections afforded by that bond, notwithstanding that MSTN was not formed until July 3, 2024.

56. Defendants also furnished investor-facing materials, including private placement memoranda, deed certificates, and related offering documents that repeated and reinforced these representations. Defendants falsely conflated track records of predecessor funds (GPACC Fund 1, Catalyst Fund, 9Mountains Fund, and GPACC Fund 2), none of which were issued or sponsored by MSTN or MPCM, with the limited or nonexistent history of the MPCM Notes. As a result, the MPCM Notes created a misleading impression that the same management team and performance history applied to the notes MPCM Investors purchased.

57. Defendants represented to MPCM Investors that MPCM Note proceeds would flow through Six Senses Private Credit, a Singapore-domiciled Variable Capital Company sub-fund under First Degree Fund VCC, into Mosaic Global Capital ("Mosaic") for deployment into litigation asset vehicles. No available document confirms the quantum of MPCM Note proceeds that were actually transmitted along this represented chain.

58. On a recorded March 6, 2025 call, Melville introduced prospective investors to Samuel Kesil Simpson of Mosaic and Josh Meyers ("Meyers") of Cedars Hill Group ("Cedars Hill"), the investment bank supporting Mosaic, providing investors with a false sense of confidence in the products.

59. Melville himself confirmed the disconnect between the investment representations made to investors and the actual use of their funds. In a written statement dated February 26, 2026, Melville stated: "Mosaic is a private fund and investors are not investing in litigation through Manhattan notes or any LABN notes. They are investing into a debt instrument. This means the benefit is for Manhattan." This admission demonstrates that Defendants knew the capital-protection and investment-deployment representations made to MPCM Investors were false. Investor funds were not being deployed into litigation assets as promised but were instead retained for the "benefit" of the entity itself.

60. On or about May 31, 2025, Defendants represented to MPCM Investors that the Manhattan investment platform had funded approximately 719 transactions, deployed approximately $93.7 million, and achieved a 0.39% default rate, while separately representing that the Manhattan ST Notes platform itself had experienced a 0.00% default rate.

61. On June 26, 2025, Peninsula launched "Project Divestiture" ("PRO DIV"), through which Tier I Peninsula investors were offered conversion of their holdings to the

Manhattan platform via 380 Capital LLC, and on July 7, 2025, trilateral conversion agreements between investors, Peninsula investor funds, and MSTN were executed effecting the transfer of funds.

62. On or about October 26, 2025, Defendants circulated a sales communication referencing a deed declaration, UCC filing, and a purported $50 million indemnity structure as additional assurances of investor protection. The collateral representations made to MPCM Investors were internally inconsistent and fabricated. Investor-facing Deed Certificate materials claimed a $50,000,000.00 limit of indemnity, while the underlying Delaware UCC filing references only a $25,000,000.00 limit. A subsequent filing references a $65,000,000.00 limit. These discrepancies between the representation made to MPCM Investors and the legal filings constitute affirmative evidence of misrepresentations.

**MPCM Investors' Reliance on Defendants' False Representations**

63. MPCM Investors reasonably relied upon Defendants' knowingly false representations on various dates including January 31, 2025, May 21, 2025, July 17, 2025, July 31, 2025, December 15, 2025, January 2, 2026, February 6, 2026, March 5, 2026, March 16, 2026, and April 14, 2026 and wired funds ranging from tens of thousands of dollars to millions of dollars[6] to accounts designated by Defendants for the purchase of Manhattan investment products, including the Series 1AA, ELITE Gold, ELITE Diamond, Sovereign 95X, Sovereign 95XX, and Black Label offerings.

[6] Minimum investment amounts on Manhattan and Peninsula products ranged from US $50,000, for the 9M Converter Bonds offered by Peninsula Capital Trust and Manhattan Series 1AA and ELITE Gold Series II products, up to $500,000 for the Manhattan ELITE Invitation Series product.

64. In addition, on May 21, 2025, MPCM Investors wired $50,000.00 to an account designated by Defendants for the purchase of Manhattan Series 1AA Notes. Following receipt of MPCM Investors' funds, Defendants confirmed that the investment had gone "live" on or about May 22, 2025.

65. From approximately May 2025 through May 2026, Defendants repeatedly reassured the MPCM Investors through emails, portal communications, investment statements, coupon notices, telephone calls, and distribution notices that MPCM Investor funds had been successfully deployed, that the investments remained profitable and fully protected, and that MPCM Investors would continue receiving the promised coupon and principal payments. These assurances continued even as Defendants solicited additional investments and rollover transactions from existing and prospective investors.

66. All of the aforementioned assurances were fraudulent and known by Defendants to be fraudulent.

**Defendants' Banking Structure**

67. Defendants directed MPCM Investor subscription funds to a centralized multi-bank, multi-currency banking structure under their control. All thirteen MPCM Notes products shared a single BMO Bank N.A. account (ending in xxxx2500) for USD subscriptions.

68. Defendants also directed MPCM Investor funds to accounts at DBS Bank Hong Kong, Banking Circle S.A. in Copenhagen, ANZ Melbourne, DBS Bank Singapore, and Cambridge Mercantile Corp. (UK) Limited. The ANZ Melbourne account, an Australian domestic AUD account, was purportedly held for MSTN, however was registered with Australia's Confirmation of Payee system to "Airwallex Pty Ltd," not to MSTN. The result

being that MPCM Investor funds were directed to a third-party intermediary account rather than an account in the issuer's own name.

69. Wire confirmations and payor-account records identify that Defendants used third-party payment processors, including Wise Payments Ltd. as source account operator for outbound payments "on behalf of MANHATTAN ST NOTES LLC" and "on behalf of AIRWALLEX (UK) LIMITED." These wire confirmations do not state conventional source-side account numbers, routing numbers, or SWIFT/BIC codes, indicating that Defendants deliberately structured their fund flows to maximize opacity and impede tracing.

70. By September 21, 2026, discovery obtained pursuant to the September 3 Order had moved materially beyond corporate and product relationships into actual banking activity. The investigation established that no MPCM bank accounts were located. Instead, all investor funds were run through the Peninsula and MSTN accounts, with the MSTN BMO account appearing to be the principal account.

**Tracing of Fund Flows Through the Enterprise**

71. This evidence materially refined the role of the Peninsula entities: Peninsula was no longer merely an issuer or predecessor investment vehicle appearing in offering documents, but the banking documents indicated Peninsula accounts were part of the operational money movement. The Peninsula maintained accounts in both the name of Peninsula Accumulator Trust (including East-West Bank accounts ending in x5730, x2641, x2642, and x2643) and Peninsula Capital Trust (including BMO sister accounts ending in x4809).

72. Subsequent investigation traced funds from the Peninsula Accumulator East West account into a Peninsula Capital BMO account and MSTN Evolve accounts during April and May 2026. Because Delaware corporate records establish that Peninsula Accumulator Trust and

Peninsula Capital Trust are the same statutory trust (with a certificate of amendment dated September 19, 2024, changing the name), this demonstrated internal transfers within the same entity's accounts as part of the fund movement operation.

73. The evidence further established a more complicated downstream structure involving First Degree Fund VCC sub-funds. The investigation traced MPCM investor funds as follows: investor funds were sent to MSTN and MPCM as purchase money for MSTN investment products; the funds flowed from MSTN to MPCM and were then used to pay early investors in the MSTN investment product until late 2025, when a portion of the funds were used as equity capital for First Degree Fund VCC sub-funds 6S (Six Senses Private Credit), 9Mountains Capital Fund, and Gipfel, through which a portion of those funds were then invested into Mosaic between April 22, 2026 and May 21, 2026Critically, despite investors buying MSTN notes beginning in October 2024 and receiving coupon payments beginning in November 2024, the investigation had not located the underlying investments represented to those investors. Mosaic had received the money only recently and therefore had not consummated an investment in an underlying asset at the time investors were told their funds were backed by revenue-generating litigation assets. This represents the most significant evolution in the Manhattan analysis: the investor-facing story was that MSTN funds supposedly were backed by investment activity, including litigation finance, but what the investigation showed was that money moved among MSTN, MPCM, and downstream First Degree structures without the actual identifiable Mosaic investment occurring until much later, and Mosaic had not yet invested the funds into an underlying asset.

74. The Corpay production then revealed another significant route: on June 8, 2026, $5 million was transferred from the MSTN Corpay account to MPN's iFAST Global Bank

account in the United Kingdom, described as "Subscription Platform Seed Funding." This documentary evidence established that the Seychelles operation, previously understood only as a possible post-MPCM successor, had direct financial connections to the existing MSTN operations, with documented wire transfers of investor funds to the offshore successor entity.

**The U.K. Investors, Agents and Bank Accounts**

75. Defendants, individually and in concert with one another, knowingly made misrepresentations and omissions to investors in the United Kingdom that caused them to invest substantial amounts of money.

76. Victims in the U.K. include, but are not limited to, the following investors who invested the following amounts into the specified investments: (i) PDM Partners Ltd (Paul MacGregor) invested GBP 250,000 in 46 ELITE Diamond Series III Subscription 47; (ii) Nadeem Hashmi invested GBP 200,00 in 49 ELITE Diamond Series III Subscription 48; (iii) Benjamin Greensmith invested GDP 150,000 in 50 ELITE Diamond Series III Subscription 50; (iv) Neil Crowden invested GDP 200,000 in 51 ELITE Sovereign 95XX Subscription 51; (v) Rian Doyle invested GDP 100,000 in ELITE Sovereign 95X Subscription 51; (vi) Charles Jackson invested GDP 50,000 in ELITE GOLD Series II Subscription 53; (vii) Ashutosh Madhukar More invested GDP 250,000 in 54 ELITE Sovereign 95XX Subscription 54; (viii) Philip Eiszele invested $100,00 into 55 ELITE Sovereign 95XX Subscription 55; (ix) Mark Tuckey invested GDO 40,000 into 56 ELITE GOLD Series II Subscription 56; (x) Ines Everman invested GDP 101,550 into 57 ELITE GOLD Series II Subscription 57; (xi) Sharon Norris invested GDP 101,550 into 58 ELITE GOLD Series II Subscription 58; (x) Paul Reynolds invested GDP 150,000 into 59 ELITE Sovereign 95XX Subscription 60.

77. The Manhattan Defendants utilized banks and payment processors in the United Kingdom to carry out their scheme including, but not limited to: (i) Wise Payments Limited; (ii) Currency Cloud Limited; (iii)_BMO Bank N.A., using a £ denominated account; (iv) East West Bank, using a £ denominated account; and (v) Airwallex (UK) Ltd.

78. The MPCM Investors located in the United Kingdom used multiple agents that were also located in the U.K. including, but not limited to: (i) Hays Mews Capital Ltd, a company registered in England with Registration No. 14977469; (ii) Consult Group Worldwide Ltd, a private limited liability company incorporated in the U.K. with Registration No. 9566121; and (iii) Woodville Consultants Ltd, a company registered in England and Wales with Registration No. 08093201.

79. In furtherance of their scheme, Defendants instructed the MPCM Investors located in the U.K. to send funds originating from and through banks and payment processors such as Lloyds Bank plc, HABC Bank plc, and Revolut Ltd/Revolut Bank Ltd.

80. The MPCM Investors located in the U.K. alone have lost millions of pounds in investments with Defendants.

**The Scheme Unravels**

81. Unbeknownst to MPCM Investors, the purported 100% principal protection marketed for the MPCM Notes was illusory: the purported guarantor, Gipfel, has no Delaware corporate registration, no registration with the National Association of Insurance Commissioners, no state insurance department licensing in any jurisdiction, and no listing in the U.S. Treasury's Circular 570 of companies authorized to underwrite federal surety bonds.

82. Neither MPCM nor MSTN has ever registered the MPCM Notes, or any offering of securities, with the SEC, FINRA, NFA, or MSRB, and no Form D exemption notice or a

California 25102(f) exemption notice has ever been filed for any of the MPCM Notes, despite investments made by numerous US persons, including ones domiciled in California.

83. Despite reportedly raising tens of millions of dollars from investors, neither MPCM nor MSTN discloses any managing member, founder, beneficial owner, or equity holder in any public filing, and MSTN[7] maintains no independent website, social media presence, telephone number, employees, or officers or directors of its own, transacting with investors exclusively through the MPCM brand.

84. First Degree Global Asset Management Pte. Ltd., the Singapore-licensed fund manager whose regulatory license underlies the Six Senses Private Credit vehicle and Gipfel for which MPCM is the named Fund Sponsor and Ultimate Beneficial Owner, has publicly and categorically denied any involvement in the MPCM Notes, stating that no "First Degree Fund" ever provided a surety or performance bond for the products, and that neither MSTN nor MPCM has been authorized to speak on its behalf.

85. Defendants' pattern of acquiring, exploiting, and liquidating corporate legal structures extended beyond the United States. On May 28, 2025, per a Luxembourg notarial deed (RCS B267602, filing reference L250197233), MPCM became the sole shareholder of a Luxembourg-registered entity originally called Asset Tribe Management Sàrl, which was immediately renamed it Capitalis Premiere Group ("CPG"), and identified Hunter as its sole manager.

86. MPCM expanded the entity's stated purpose to include acting as general partner or manager of securitization vehicles. Four months later, in September 2025, Luxembourg's

[7] As MSTN is the entity that issued the MPCM Notes, they have a contractual obligation to repay Plaintiffs.

Commission de Surveillance du Secteur Financier ("CSSF") fined CPG €10,000.00 for total non-cooperation with anti-money-laundering compliance.[8]

87. Seven months after that sanction, on April 21, 2026, MPCM as sole shareholder appointed Hunter as liquidator of CPG, granting her the broadest possible powers to distribute assets in cash or in kind at her discretion. This model of acquiring a regulatory legal structure, utilizing it briefly, refusing to cooperate when requested by regulators, and subsequently dissolving the entity is consistent with the broader pattern of Defendants' enterprise.

88. On or about April 2, 2026, while the original MPCM trading platform was already experiencing payment defaults and deteriorating investor relations, the Seychelles operation was publicly announced via GlobeNewswire press release, raising substantial concern of exit structuring designed to move assets and operations beyond the reach of MPCM Investors and other defrauded investors. Bank statements received in response to a subpoena issued pursuant to the September 3 Order subsequently identified the actual Seychelles entity as Manhattan Private Network Ltd., located at 306 Victoria House, Seychelles, which was different from the "Manhattan Private Credit (Seychelles)" designation previously announced publicly.

89. Beginning in approximately April 2026, investors across all MPCM Notes began experiencing payment delays, which Defendants attributed to "bank changes."

90. On May 8, 2026, MPCM committed in writing to clear all payment arrears within "2 to 4 weeks," a commitment that Defendants did not honor.

---

[8] CPG never submitted a necessary questionnaire to CSSF, never requested a meeting with CSSF, and never responded to any requests made by the CSSF.

91. Consistent with the fraudulent nature of Defendants' scheme, on June 5, 2026, the online investor platform used to access account information for the MPCM Notes was shut down.

92. On June 12, 2026, Hunter, MPCM's Group Chief Executive Officer, issued a "Public Interest Statement" described as a resignation, audit notice, and preservation notice.

93. Bentley resigned as MPCM's Chief Operations Officer a few days after Hunter's June 12, 2026 "Public Interest Statement", and the Manhattan LinkedIn page was deleted the same day as Hunter's resignation.

94. On June 14, 2026, an IC3 complaint was filed regarding the scheme, and on June 15, 2026, an SEC complaint was filed reporting non-payment, deletion of the investor portal, and that the purported insurance backing the MPCM Notes had been verified as "FAKE."

95. On June 17, 2026, Peninsula issued a "Notice to Investors" redirecting payments to Saville at JPMorgan Chase Bank, N.A.

96. On June 20, 2026, investors began publicly reporting missed payment schedules, reduced communications, and an inability to obtain account information or redemptions.

97. By June 25, 2026, Defendants' personnel ceased responding to MPCM Investors entirely, and MPCM Investors and other investors suffered full loss of portal access.

98. At this time, it was confirmed that insurance policies MPCM Investors were told protected their investments, did not exist and First Degree Global Asset Management publicly and categorically denied any involvement with MSTN or the MPCM Notes.

99. On July 1, 2026, an SEC complaint was filed reporting that over 100 investors had been impacted by the scheme, with losses estimated to exceed $250 million.

100. Approximately 400 claimants have registered with Plaintiff.

101. On July 7, 2026, a Joint Prosecution and Common Interest Agreement was executed, listing more than thirty-five distribution partner firms coordinating a collective legal effort against the Manhattan entities.

102. On August 4, 2026, Hunter wrote to BMO Bank N.A.'s fraud team requesting anti-money-laundering action and a freeze over a MSTN account, and separately asked NovoBanco to issue a SWIFT MP199 alert to BMO. A separate investor independently approached BMO's Chicago Branch Compliance to verify the MSTN account held at BMO Bank N.A., Chicago, account ending in xxxx2500, the central USD banking rail for all thirteen MPCM Note products.[9]

103. In or about June 2026, a Wyoming LLC named Sahara Lion Company LLC ("Sahara Lion") was filed and presented on the public page of IFW Global, the forensic investigation firm retained by Hunter, as the entity managing operational Manhattan inquiries.[10]

104. Sahara Lion's only contact information is an encrypted Proton email address (saharalionco@proton.me), with no phone number or physical office. Wyoming is among the least transparent U.S. LLC jurisdictions, requiring no member or manager disclosure. The emergence of this entity is consistent with additional victims being targeted, particularly individuals who have already invested and lost funds.

105. These actions indicate Defendants' operations are winding down and that remaining assets are at imminent risk of dissipation, concealment, or removal absent immediate judicial intervention.

---

[9] This account appears repeatedly in MPCM Investor complaints and investigative materials as the repository through which investor subscription funds were channeled.

[10] IFW Global holds a disbursements record covering 547 investors.

**The Fraud Continues**

106. Following the collapse, Peninsula continued to operate while Manhattan went dark. On July 27, 2026, Peninsula circulated a Distribution Representative Due Diligence Questionnaire to at least one agent, seeking identity, ownership, sanctions, export-control, and distribution-structure information as a precondition to potential appointment.

107. On or about August 7–10, 2026, Peninsula sent a First Amendment to Promissory Note to at least one investor via DocuSign, seeking to extend the redemption date of an outstanding X-90 APEX note to September 30, 2026, grant additional consideration equal to 7.25% of principal, and require the investor to waive all existing defaults.

108. These post-collapse amendment efforts are significant because any extension, waiver, or conversion may restart maturity timelines, vary investor rights, or compromise an investor's default position if signed without independent legal advice.

109. Cross-border investigation confirmed that the contact information for Defendants is deliberately minimal. Adebiyi and others have no contact footprint across registry, WHOIS, and aggregator databases. For a network with such a well-documented corporate structure, this level of total absence of identification at the personnel level is consistent with the use of minor or nominee roles, or deliberately unlisted principals designed to frustrate enforcement efforts.

110. To date, Defendants have not responded to Plaintiffs' numerous demands for payment and Plaintiffs have not received payment as promised.

111. Moreover, there is a substantial risk that, absent immediate attachment and restraint, Defendants will dissipate, transfer, conceal, or otherwise place beyond the reach of creditors the assets currently available to satisfy any judgment entered in this action. Immediate attachment is therefore necessary to preserve the status quo and ensure that sufficient assets

remain available to satisfy a judgment in favor of Plaintiffs and the class of investors they represent. Unless such relief is granted, Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law, as any funds still held by Defendants may be dissipated, transferred, or concealed before judgment can be entered and enforced.

112. No security interest, pledged collateral, or financing statement has been identified with respect to any assets purportedly backing the MPCM Notes, and no traditional secured lending relationship or asset-preservation mechanism exists to protect Plaintiffs' interests pending resolution of this action.

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Fraud)

113. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 112 of this complaint as if fully set forth herein.

114. Defendants knowingly and intentionally devised and executed a scheme or artifice to defraud Plaintiffs, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in violation of New York common law. Specifically, Defendants made the following material misrepresentations of fact, among others: (a) that the MPCM Notes were backed by 100% principal protection through valid surety bonds issued by Gipfel; (b) that Pershing was a legitimate guarantor entity; (c) that the MPCM Notes were properly licensed and registered investment products; (d) that investor capital would be deployed into revenue-generating litigation assets through the Six Senses Private Credit vehicle; and (e) that the predecessor fund track record applied to the MPCM Notes.

115. Each of these representations was false when made. Defendants knew these representations were false, or made them with reckless disregard for their truth, as evidenced by,

among other things: the non-existence of Gipfel as a licensed insurer; the backdating of the Insurance Bond to a date preceding MSTN's incorporation; the categorical public denials by First Degree Global Asset Management and others; and the absence of any SEC registration or Form D filing exemption for any MPCM Note.

116. Defendants made these false representations for the purpose of inducing Plaintiffs to invest their funds, and Defendants transmitted or caused to be transmitted these representations through means and instruments of interstate commerce, including websites, electronic communications, DocuSign subscription agreements, WhatsApp messages, telephone calls, and marketing emails.

117. Plaintiffs reasonably relied on Defendants' misrepresentations in deciding to invest their funds. Plaintiffs' reliance was reasonable because Defendants presented themselves as experienced financial professionals, provided investor-facing materials including private placement memoranda and investment certificates that reinforced their representations, and operated a sophisticated online investment platform that displayed account balances, maturity dates, and coupon payment schedules.

118. Defendants' material and false representations, as set forth above, directly and proximately caused Plaintiffs' losses. As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $105,892,547.02 which represents the net of the total cash invested into MPCM debt products less cash payments received by the MPCM investors as of August 18, 2026. Of the claim amount, $21,318,643.63 of the principal amount invested is currently in default and $84,573,903.39 of the principal amount invested is currently outstanding. The outstanding principal amounts will come due on variable maturity dates ranging from 90-270 days from date of initial investment which are responsibly anticipated

to default at the end of the current maturity period for each MPCM investor holding an outstanding debt product. The promised interest payments for the investment products range from 6%-12% and were to be paid on variable time tables ranging from payments every 60 days to payments every 180 days. The accumulated interest payments have not yet been factored into the claim amount. These amounts have been calculated from 572 investments made by the 373 MPCM Investors which have, thus far, provided their investment data out of the 541 investors of record of MPCM debt products. The investments were denominated in various currencies, including Emirati Dirhams, Australian Dollars, Canadian Dollars, Swiss Francs, Euros UK Pounds Sterling, Singapore Dollars, and US Dollars. The non-US currency denominated investments were converted to USD using the end of U.S. day spot price (rounded to the nearest cent) for those foreign currencies as of August 17, 2026. The amount, in their native currencies are as follows: AED: Đ 22,998,548; AUD: $3,172,700; CAD: $1,339,017.50; CHF: *fr.* 5,010,241.50; EUR: €9314820; GBP: £17,737,344.47; SGD: $1,537,760 and USD: $55,128,539.23

119. Punitive damages should be awarded here because Defendants have engaged in gross, wanton, and willful conduct and their conduct evidences a high degree of moral culpability. Public interest will be served by granting punitive damages in order to deter these Defendants and others from engaging in egregious conduct of this sort.

**Second Claim for Relief**
**(Conversion)**

120. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 119 of this complaint as if fully set forth herein.

121. Plaintiffs invested specific, identifiable funds with Defendants by wire transfer to accounts designated by Defendants, including BMO Bank N.A. Account ending in xxx2500,

and other accounts identified herein. These funds constituted Plaintiffs' personal property over which Plaintiffs had a superior right of possession.

122. Defendants, acting individually and in concert with one another, intentionally and without authorization exercised dominion and control over Plaintiffs' funds in a manner inconsistent with Plaintiffs' rights, including by: (a) failing to deploy investor capital into the represented litigation-asset investments; (b) diverting funds to insider payments; (c) redirecting payments to Saville at JPMorgan Chase following the scheme's collapse; (d) shutting down the investor portal to prevent Plaintiffs from accessing their account information; and (e) failing to return Plaintiffs' principal upon maturity or demand.

123. Plaintiffs have demanded the return of their money and Defendants have refused.

124. Defendants, acting individually and in concert with one another, have converted no less than $105,892,547.02 from Plaintiffs.

125. Punitive damages should be awarded because Defendants have engaged in gross, wanton, and willful conduct and their conduct evidences a high degree of moral culpability. The public interest will be served by granting punitive damages in order to deter these Defendants and others from engaging in egregious conduct of this sort.

**Third Claim for Relief**
**(Unjust Enrichment)**

126. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 125 of this complaint as if fully set forth herein.

127. Defendants received and retained the benefit of the funds that Plaintiffs invested in the MPCM Notes, totaling no less than $105,892,547.02.

128. Defendants retained this benefit at Plaintiffs' expense, without providing Plaintiffs the promised returns or the return of their principal.

129. Under principles of equity and good conscience, Defendants should not be permitted to retain the funds that Plaintiffs invested, and it would be inequitable for Defendants to do so.

130. As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $105,892,547.02.

**Fourth Claim for Relief**
**(Negligent Misrepresentation)**

131. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 130 of this complaint as if fully set forth herein.

132. Defendants held themselves out to Plaintiffs as possessing special knowledge and expertise in structured finance and litigation-asset-backed lending, and as having verified the licensing, registration, and insurance status of the MPCM Notes and their purported principal-protection features, thereby assuming a duty to Plaintiffs to provide accurate information regarding those matters.

133. Defendants carelessly and negligently supplied false information to Plaintiffs regarding, among other things, the existence and validity of the surety bonds purportedly issued by Gipfel and the registration and licensing status of the MPCM Notes, without confirming the truth of these representations.

134. Plaintiffs reasonably relied on Defendants' negligent misrepresentations in deciding to invest in the MPCM Notes.

135. Defendants owed a duty to provide accurate information to Plaintiffs because of their superior knowledge regarding the MPCM Notes' structure, the existence, or non-existence, of the purported insurance backing, and the regulatory status of the offerings, and because Plaintiffs had no independent means to verify these representations.

136. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $105,892,547.02.

**Fifth Claim for Relief**
**(Civil Conspiracy)**

137. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 136 of this complaint as if fully set forth herein.

138. Defendants MPCM, MSTN, Peninsula Capital Trust f/k/a Peninsula Accumulator Trust, Peninsula Accelerator Trust, Saville, DigitanWorks, Dovera, Rodgers and Associates, Pershing, Crown Global, Manhattan Private Network Ltd., M5OP, and the individual Defendants Hunter, Bentley, Melville, Rodgers, Craig, Benz, Adebiyi, and Catt reached an agreement, express or tacit, to accomplish the fraudulent scheme described above, including the creation of the multi-entity corporate architecture, the marketing of the MPCM Notes through representations of principal protection and licensed surety backing that Defendants knew or recklessly disregarded were false, and the diversion and concealment of investor funds.

139. In furtherance of this agreement, Defendants committed overt acts, including: (a) forming and operating the layered entity structure (MSTN, MPCM, M5OP, Peninsula trusts, Saville) to obscure beneficial ownership; (b) marketing the MPCM Notes through the MPCM platform and its multi-tier distribution network; (c) creating and disseminating the fabricated Insurance Bond and MTCP framework; (d) directing investor funds to centralized bank accounts while using third-party payment processors to obscure fund flows; (e) issuing false assurances to Plaintiffs regarding the safety and status of their investments; (f) misappropriating Plaintiffs' invested funds; (g) incorporating Manhattan Private Network Ltd. in the Seychelles and transferring $5 million from MSTN on June 8, 2026 as "Subscription Platform Seed Funding";

and (h) activating Saville's JPMorgan Chase account to dissipate assets following the scheme's collapse.

140. Each Defendant intentionally participated in furtherance of the conspiracy with knowledge of its fraudulent object.

141. As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $105,892,547.02.

**Sixth Claim for Relief**
**(Accounting and Constructive Trust)**

142. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 141 of this complaint as if fully set forth herein.

143. Defendants received and continue to hold funds belonging in equity to Plaintiffs, and no security interest, pledged collateral, or financing statement has been identified with respect to any assets purportedly backing the MPCM Notes, such that in equity and good conscience Defendants should not be permitted to retain those funds without providing a full accounting.

144. Plaintiffs are entitled to a full accounting from Defendants of all funds received from Plaintiffs, all uses to which those funds were put, and the current location and status of any remaining funds or assets.

145. Plaintiffs are further entitled to imposition of a constructive trust over any funds or assets traceable to Plaintiffs' investment in the MPCM Notes, to prevent Defendants' unjust enrichment and the dissipation of assets pending resolution of this action.

146. Plaintiffs are further entitled to an accounting of: (a) all bank accounts held in the name of MSTN, MPCM, or any other Defendant entity, including without limitation BMO Bank N.A. Account ending in xxxx500 and the JPMorgan Chase Account No. xxxxx0917 to which

payments were redirected in June 2026; (b) all transfers made to or from such accounts; (c) all payments made to individual Defendants, distribution partners, or third parties from investor funds; and (d) the current location of all remaining investor funds or assets traceable thereto.

**Seventh Claim for Relief**
**(Violation of §12(a)(1) of the Securities Act of 1933, 15 U.S.C. §77l(a)(1))**

147. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 146 of this complaint as if fully set forth herein.

148. The MPCM Notes, including the Manhattan Series 1AA, ELITE Gold Series I–III, ELITE Diamond Series I–IV, ELITE Sovereign 95X and 95XX Series, ELITE Black Label Program Signature Series I, and ELITE Premier 300 Series I, are "securities" within the meaning of §2(a)(1) of the Securities Act of 1933, 15 U.S.C. §77b(a)(1), because they constitute "notes" and "investment contracts" involving the investment of money in a common enterprise with the expectation of profits derived solely from the efforts of others.

149. Defendants offered and sold the MPCM Notes to Plaintiffs by use of means and instruments of interstate commerce, including through Defendants' websites, electronic communications, DocuSign subscription agreements generated from a shared IP address (52.163.187.236), wire transfers through BMO Bank N.A. in Chicago, and a network of over thirty-five distribution partners, none of which were registered as broker-dealers with FINRA.

150. No registration statement was filed with the SEC for the MPCM Notes, and no valid exemption from registration applied, as no Form D exemption notice was ever filed for any of the MPCM Notes.

151. As a result of the foregoing, Plaintiffs are entitled to rescind their purchase of the MPCM Notes and recover the consideration paid therefor, plus interest, or, if Plaintiffs no longer own the MPCM Notes, to recover damages.

**<u>Eighth Claim for Relief</u>**
**<u>(Violation of §10(b) of the Securities Exchange</u>**
**<u>Act of 1934 and Rule 10b-5, 15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5)</u>**

152. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 151 of this complaint as if fully set forth herein.

153. In connection with the purchase and sale of the MPCM Notes, Defendants made material misrepresentations and omissions to Plaintiffs, including regarding the existence and validity of surety bonds purportedly backing the MPCM Notes, the licensing status of the purported guarantor, Gipfel, and the registration status of the MPCM Notes as securities.

154. Defendants made these misrepresentations and omissions with scienter, knowing them to be false or acting with reckless disregard for their truth, as reflected by, among other things: (a) the absence of any identifiable insurance licensing for Gipfel in any jurisdiction; (b) the public disclaimer issued by First Degree Global Asset Management denying that any "First Degree Fund" provided a surety or performance bond for the MPCM Notes; (c) the "Short Term Notes Insurance Bond" bearing a date that predates MSTN's legal existence by two days; (d) Pershing's co-location at a mass-market registered-agent address with no identifiable corporate presence, insurance licensing, or regulatory registration; (e) the collateral discrepancy between the UCC filing and investor-facing representations; (f) the LEI mismatch in which MSTN's LEI was displayed on the MPCM website as though it belonged to MPCM; (g) the conflation of predecessor fund track records with the MPCM Notes' unrelated issuer entities; and (h) the continued solicitation of new investments and rollovers during the period of active payment defaults.

155. Plaintiffs reasonably relied on Defendants' material misrepresentations and omissions in purchasing the MPCM Notes.

156. As a direct and proximate result of Defendants' violations of §10(b) and Rule 10b-5, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $105,892,547.02.

**Ninth Claim for Relief**
**(Violation of New York General Business Law §349)**

157. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 156 of this complaint as if fully set forth herein.

158. Defendants' conduct in marketing and selling the MPCM Notes to Plaintiffs and other investors, including through Defendants' publicly available websites and marketing materials, constitutes consumer-oriented conduct occurring in the State of New York.

159. Defendants' representations regarding the principal-protected nature, licensing, and registration status of the MPCM Notes were materially misleading and deceptive to a reasonable consumer.

160. As a result of Defendants' deceptive acts and practices, Plaintiffs suffered injury, including the loss of their invested funds.

161. Defendants' deceptive practices were not limited to private transactions but were consumer-oriented in nature, in that Defendants used publicly available websites, mass-marketed investment products through a network of over thirty-five distribution partners, and published marketing materials accessible to the investing public at large.

162. As a direct and proximate result of Defendants' violations of §349, Plaintiffs have been damaged in an amount to be determined at trial, but not less than $105,892,547.02.

163. Plaintiffs are entitled to recover their actual damages, treble damages up to $1,000 as available under N.Y. Gen. Bus. Law §349(h), and reasonable attorneys' fees.

## Tenth Claim for Relief
## (Violation of 18 U.S.C. § 1962 - Civil RICO)

164. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 163 of this complaint as if fully set forth herein.

165. At all relevant times, Defendants MPCM, MSTN, Peninsula Capital Trust f/k/a Peninsula Accumulator Trust, Peninsula Accelerator Trust, Saville, DigitanWorks, Dovera, Rodgers and Associates, Pershing, Crown Global, Manhattan Private Network Ltd., M5OP, and the individual Defendants Hunter, Bentley, Melville, Rodgers, Craig, Benz, Adebiyi, and Catt were "persons" within the meaning of 18 U.S.C. § 1961(3), capable of holding a legal or beneficial interest in property.

166. At all relevant times, the "MPCM Enterprise" was an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants and their agents, employees, and affiliated entities, which functioned as a continuing unit for the common purpose of defrauding investors by marketing and selling fraudulent investment products, collecting investor funds, and diverting those funds for their own use and benefit through a multi-layered corporate structure designed to obscure beneficial ownership and frustrate enforcement efforts.

167. The MPCM Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which it engaged, including: (a) a defined hierarchy with Craig as the alleged controller and head of Peninsula; Hunter as Group CEO spanning MPCM, MSTN, Saville, and Dovera; Bentley as COO directing operational personnel; Melville as Chief Commercial Officer; Rodgers as CFO managing payment processing and financial records; Adebiyi as Chief Investor & Communications Officer coordinating investor relations; and Benz as Managing Director of DigitanWorks controlling the technology infrastructure; (b) a coordinated multi-entity corporate architecture spanning Delaware trusts, New York and

Delaware LLCs, and offshore entities in the Seychelles, Luxembourg, UAE, Australia, Switzerland, and Singapore; (c) a centralized banking structure directing investor funds through BMO Bank N.A., East West Bank, DBS Bank, ANZ Melbourne, Banking Circle S.A., and third-party payment processors including Wise Payments Ltd. and Airwallex; and (d) a unified technology platform operated by DigitanWorks providing the InvestorDisplay portal and shared DocuSign infrastructure.

168. Defendants conducted or participated, directly or indirectly, in the conduct of the MPCM Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), consisting of multiple acts indictable under the following federal statutes:

(a) Mail Fraud, 18 U.S.C. § 1341: Defendants used the United States mail and commercial interstate carriers to transmit subscription agreements, investment certificates, private placement memoranda, coupon payment notices, and marketing materials containing the false representations described herein to MPCM Investors nationwide;

(b) Wire Fraud, 18 U.S.C. § 1343: Defendants used interstate wire communications, including email, electronic fund transfers through BMO Bank N.A. and other financial institutions, DocuSign subscription agreements transmitted from IP address 52.163.187.236, WhatsApp messages, telephone calls, and the InvestorDisplay portal to transmit false and fraudulent representations to MPCM Investors and to collect and transfer investor funds;

(c) Money Laundering, 18 U.S.C. §§ 1956 and 1957: Defendants conducted and attempted to conduct financial transactions involving the proceeds of wire fraud and mail fraud, knowing that the transactions were designed to conceal the nature, location,

source, ownership, and control of such proceeds, including by directing investor subscription funds through a centralized multi-bank, multi-currency banking structure spanning BMO Bank N.A., East West Bank, DBS Bank Hong Kong, Banking Circle S.A., ANZ Melbourne, DBS Bank Singapore, Cambridge Mercantile Corp. (UK) Limited, and third-party payment processors including Wise Payments Ltd. and Airwallex, and by transferring $5 million from the MSTN Corpay account to Manhattan Private Network Ltd.'s iFAST Global Bank account in the United Kingdom.

169. The pattern of racketeering activity consisted of hundreds of related predicate acts occurring from at least October 2024 through the present, including but not limited to: (i) the creation and dissemination of fabricated documents including a "Short Term Notes Insurance Bond dated as of July 1, 2024" that predates MSTN's legal existence; (ii) false representations to 572 individual investors regarding 100% principal protection, licensed surety backing, and deployment of funds into litigation assets; (iii) the collection of no less than $105,892,547.02 in investor funds through wire transfers to accounts controlled by Defendants; (iv) the payment of "coupon" returns to early investors using funds collected from subsequent investors in a classic Ponzi scheme pattern; (v) the transfer of $5 million from MSTN to MPN in the Seychelles on June 8, 2026; and (vi) the continued operation of manhattanprivatecredit.com as a solicitation platform during active investor litigation.

170. The predicate acts were related to each other by virtue of their common purpose to defraud investors, common participants including individual Defendants and their controlled entities, common victims including the MPCM Investors, common methods of commission such as false representations regarding principal protection and investment deployment, collection of

funds through centralized banking channels, and diversion of funds for unauthorized purposes, and common results, the loss of investor capital.

171. The pattern of racketeering activity posed a threat of continued criminal activity because: (a) the predicate acts were part of Defendants' regular way of conducting their ongoing investment fraud business; (b) Defendants continued to operate successor platforms including manhattanprivatecredit.com and vip.manhattanprivatecredit.com during active litigation; (c) Peninsula continued to circulate Distribution Representative Due Diligence Questionnaires and First Amendments to Promissory Notes seeking to extend redemption dates and waive defaults; and (d) the filing of Sahara Lion with only an encrypted Proton email address is consistent with targeting additional victims.

172. Defendants' violations of 18 U.S.C. § 1962(c) and (d) directly and proximately caused injury to Plaintiffs' business or property, specifically the loss of their invested funds in the amount of no less than $105,892,547.02.

173. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their actual damages, plus costs of suit and reasonable attorneys' fees.

**Eleventh Claim for Relief**
**(Attachment pursuant to N.Y. C.P.L.R. Article 62)**

174. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 173 of this complaint as if fully set forth herein.

175. Plaintiffs have causes of action against Defendants sounding in fraud, conversion, and breach of contract, among others, and are demanding judgment for a sum stated in an amount to be determined at trial, but not less than $105,892,547.02, exclusive of interest, costs, and attorneys' fees.

176. It is probable that Plaintiffs will succeed on the merits of their claims, and the amount demanded exceeds all counterclaims known to Plaintiffs.

177. MSTN maintains no independent officers, directors, employees, or public presence, transacts exclusively through the MPCM brand, and holds its assets, if any, through opaque and undisclosed ownership structures, such that Plaintiffs have grounds to believe that Defendants have assigned, disposed of, encumbered, or secreted property, or are about to do so, with intent to defraud creditors or frustrate the enforcement of a judgment, within the meaning of N.Y. C.P.L.R. §6201(3).

178. In particular, the activation of Saville as the new payment beneficiary at JPMorgan Chase Bank, the incorporation of Manhattan Private Credit in the Seychelles, the filing of Sahara Lion in Wyoming, and the continued operation of manhattanprivatecredit.com and vip.manhattanprivatecredit.com as live solicitation platforms during active litigation, collectively demonstrate an ongoing pattern of asset concealment and exit structuring.

179. The contemporaneous incorporation of an affiliated Seychelles entity, MPC, amid the deterioration of the original MPCM trading platform and mounting investor complaints, further supports Plaintiffs' grounds to believe that Defendants intend to remove or conceal assets so as to frustrate the enforcement of any judgment Plaintiffs may obtain.

180. Plaintiffs are entitled to an order of attachment against the property of Defendants located within the State of New York, or otherwise subject to the jurisdiction of this Court, in an amount sufficient to secure satisfaction of the judgment Plaintiffs demand in this action.

## Twelfth Claim for Relief
## (Preliminary Injunction)

181. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 180 of this complaint as if fully set forth herein.

182. Plaintiffs are likely to succeed on the merits of their claims. Defendants marked and sold unregistered securities through materially false representations of principal protection backed by a non-existent insurer, collected no less than $105,892,547.02 in MPCM Investor funds, failed to return principal or pay contractually required coupons, shut down the investor portal, ceased communications, and are actively incorporating new entities in offshore jurisdiction while soliciting amendments designed to waive investor default rights.

183. Plaintiffs will suffer irreparable harm absent injunctive relief. Defendants have demonstrated an ongoing pattern of asset dissipation, concealment, and exit structuring, including: (a) the redirection of investor payments to Saville in June 2026; (b) the announcement of the Seychelles operation during the period of active payment defaults; (c) the transfer of $5 million from MSTN to MPN's iFAST Global Bank account on June 8, 2026 as "Subscription Platform Seed Funding"; (d) the liquidation of CPG through Hunter with broadest powers to distribute assets in cash or in kind; (e) the forming of Sahara Lion in Wyoming; (f) the continued operation of manhattanprivatecredit.com and vip.manhattanprivatecredit.com as live solicitation platforms; and (g) the attempted sale of Saville (and thus Peninsula) to Pro Business Consulting, and (h) Peninsula's continuing operation of its live solicitation platforms and circulation of a First Amendment to Promissory Note seeking to extend redemption dates and require investors to waive existing defaults. These actions demonstrate that Defendants' remaining assets are at imminent risk of being transferred, dissipated, or placed beyond the reach of Plaintiffs and this Court.

184. Additionally, there is an action pending in Delaware Chancery Court in which Defendants to this action have been sued including, but not limited to, Carol Hunter. The Delaware Chancery Court issued an Order on July 7, 2026 freezing accounts belonging to

Saville and Peninsula and barring Carole Hunter from acting or purporting to act as an authorized party for Saville Fiduciary Corporation, Peninsula Capital Trust, and Peninsula Accumulator Trust. Upon information and belief, those accounts contain proceeds to which the MPCM Investors have a claim.

185. The threatened injury to Plaintiffs substantially outweighs any harm that an injunction may cause Defendants. Plaintiffs stand to lose their entire investment of no less than $105,892,547.02if Defendants are permitted to continue transferring, concealing, or dissipating assets. By contrast, a preliminary injunction would merely preserve the status quo by preventing Defendants from moving assets that rightfully belong to Plaintiffs pending resolution of this action. Defendants have no legitimate interest in dissipating investor funds or placing them beyond the reach of this Court.

186. The public interest favors injunctive relief. The scheme has impacted nearly 400 registered claimants, the MPCM Investors, and an estimated 541 investors of record of MPCM debt products, with losses potentially exceeding $250,000,000.00. Granting injunctive relief will serve the public interest by preventing the ongoing dissipation of assets traceable to a fraudulent securities offering, deterring similar conduct, and preserving assets for the benefit of defrauded investors.

187. The claim amount represents the net of the total cash Invested into MPCM debt products less cash payments received by the MPCM investors as of August 18, 2026. Of the claim amount, $21,318,643.63 is currently in default and $84,573,903.39 is currently outstanding. The outstanding amounts will come due on variable maturity dates ranging from 90-270 days from date of initial investment which are responsibly anticipated to default at the end of the current maturity period for each MPCM investor holding an outstanding debt product.

These amounts have been calculated from 572 investments made by the 373 MPCM Investors which have, thus far, provided their investment data out of the 541 investors of record of MPCM debt products. The investments were denominated in various currencies, including Emirati Dirhams, Australian Dollars, Canadian Dollars, Swiss Francs, Euros UK Pounds Sterling, Singapore Dollars, and US Dollars. The non-US currency denominated investments were converted to USD using the end of US day spot price (rounded to the nearest cent) for those foreign currencies as of August 17, 2026. The amount, in their native currencies are as follows: AED: Đ 22,998,548; AUD: $3,172,700; CAD: $1,339,017.50; CHF: *fr.* 5,010,241.50; EUR: €9314820; GBP: £17,737,344.47; SGD: $1,537,760 and USD: $55,128,539.23.

188. Plaintiffs are entitled to a preliminary injunction: (a) freezing all bank accounts held in the name of MSTN, MPCM, Saville, MPN, or any other Defendant entity, including but not limited to the iFAST Global Bank account held by MPN; (b) prohibiting Defendants from transferring, encumbering, dissipating, concealing, or otherwise disposing of any assets traceable to Plaintiffs' investments; (c) requiring Defendants to repatriate any assets transferred to offshore entities, including MPN and any accounts held by or for Capitalis Premiere Group; and (d) enjoining Peninsula from circulating or executing any amendments, waivers, or conversions of outstanding notes without prior Court approval.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment in their favor as follows:

(a) on the First Claim for Relief, damages against Defendants in an amount to be determined at trial, but no less than $105,892,547.02 plus pre-judgment interest at 9% per annum, costs, expenses, attorneys' fees, and punitive damages;

(b) on the Second Claim for Relief, damages against Defendants in an amount to be determined at trial, but no less than $105,892,547.02plus pre-judgment interest at 9% per annum, costs, expenses, attorneys’ fees, and punitive damages;

(c) on the Third Claim for Relief, damages against Defendants in an amount to be determined at trial, but no less than $105,892,547.02plus pre-judgment interest at 9% per annum, costs, expenses, and attorneys' fees;

(d) on the Fourth Claim for Relief, damages against Defendants in an amount to be determined at trial, but no less than $105,892,547.02 plus pre-judgment interest at 9% per annum, costs, expenses, and attorneys' fees;

(e) on the Fifth Claim for Relief, damages against Defendants, jointly and severally, in an amount to be determined at trial, but no less than $105,892,547.02 plus pre-judgment interest at 9% per annum, costs, expenses, and attorneys' fees;

(f) on the Sixth Claim for Relief, an order directing Defendants to render a full and complete accounting of all funds received from Plaintiffs, the uses to which such funds were put, and the current location and status of any remaining funds or assets, and imposing a constructive trust over any funds or assets traceable to Plaintiffs' investment in the MPCM Notes for Plaintiffs' benefit;

(h) on the Seventh Claim for Relief, rescission of Plaintiffs' purchase of the MPCM Notes and return of the consideration paid therefore, plus interest, costs, expenses, and attorneys' fees, or, alternatively, damages against Defendants in an amount to be determined at trial;

(i) on the Eighth Claim for Relief, damages against Defendants in an amount to be determined at trial, but no less than $105,892,547.02plus pre-judgment interest at 9% per annum, costs, expenses, and attorneys' fees;

(j) on the Ninth Claim for Relief, Plaintiffs' actual damages, treble damages up to $1,000 per violation as available under N.Y. Gen. Bus. Law §349(h), plus pre-judgment interest at 9% per annum, costs, expenses, and reasonable attorneys' fees;

(k) on the Tenth Claim for Relief, threefold Plaintiffs' actual damages pursuant to 18 U.S.C. § 1964(c), plus pre-judgment interest at 9% per annum, costs of suit, and reasonable attorneys' fees;

(l) on the Eleventh Claim for Relief, an order of attachment against the property of Defendants located within the State of New York, or otherwise subject to the jurisdiction of this Court, in an amount sufficient to secure satisfaction of the judgment demanded herein;

(m) on the Twelfth Claim for Relief, a preliminary injunction freezing all bank accounts and assets of Defendants, prohibiting the transfer, encumbrance, dissipation, or concealment of any assets traceable to Plaintiffs' investments, and granting such other injunctive relief as is necessary to preserve the status quo pending resolution of this action;

(n) post-judgment interest at the maximum rate allowed by law; and

(o) such other and further relief as this Court deems just and proper.

Dated: September 29, 2026
New York, New York

**RIMON, P.C.**
*Attorneys for Plaintiffs*

By: /s/*Neal H. Levin*
Neal H. Levin (4867164)
Laura-Michelle Horgan (LR7799)
Meghan L. Lavine (4787321)
400 Madison Avenue
New York, NY 10017
Neal.Levin@rimonlaw.com
LMHorgan@rimonlaw.com
Meghan.Lavine@rimonlaw.com

## VERIFICATION

Ada Carolina Rodriguez De Thorn, under penalties of perjury, avers and verifies as follows:
I affirm this 27th day of September, 2026,

I am a member of the Steering Committee appointed by investors and agents pursuant to a Joint Prosecution and Common Interest Agreement with Steering Committee Mandate dated July 7, 2026 to coordinate the joint prosecution, investigation, litigation, recovery, asset preservation, settlement, communications, and strategic direction of claims arising from investments in Manhattan ST Notes LLC, Manhattan Private Capital Markets LLC, First Degree Asset Management, Six Senses Private Credit, Mosaic Capital, and Gipfel Capitale Insurance & Underwriting Partners (the "Steering Committee").

I am authorized to make this Verification on behalf of the Steering Committee. I have read the Amended Verified Complaint and the facts stated therein are true and correct to the best of my knowledge.

________________________________

Ada Carolina Rodriguez De Thorn