UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

THE STEERING COMMITTEE ON BEHALF OF THE PARTIES TO THE JOINT PROSECUTION AND COMMON INTEREST AGREEMENT DATED JULY 7, 2026, et al.,

Plaintiffs,

-v.-

PENINSULA CAPITAL TRUST et al.,

Defendants.

PROPOSED PLAINTIFF-INTERVENOR:

DAVID SIMPSON,

Proposed Plaintiff-Intervenor.

Case No. 1:26-cv-07519-MKV

---

# NOTICE OF PRO SE APPEARANCE AND MOTION TO INTERVENE

PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 24(a) AND 24(b), AND 28 U.S.C. § 1654

WITH (i) A MOTION FOR LEAVE TO FILE THE ATTACHED PROPOSED COMPLAINT IN INTERVENTION, (ii) A MOTION FOR A FOURTEEN (14)-DAY ENLARGEMENT OF TIME TO OBTAIN COUNSEL, AND (iii) A MOTION FOR INTERIM RELIEF PRESERVING THE EXISTING TEMPORARY RESTRAINING ORDER PENDING RESOLUTION OF THIS MOTION

---

TO THE HONORABLE COURT, THE CLERK OF COURT, AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

I, David Simpson, a natural person, respectfully enter my appearance in this action and move this Court, pro se and pursuant to 28 U.S.C. § 1654 and Federal Rules of Civil Procedure 24(a) and 24(b), for an order permitting me to intervene in the above-captioned action as a party plaintiff. I also respectfully request that the Court (a) grant me leave under Rule 24(c) to file the proposed

Complaint in Intervention attached hereto and filed herewith as Attachment 1; (b) grant me a corresponding enlargement of time to obtain counsel; and (c) preserve the status quo and not dissolve the existing Temporary Restraining Order and pre-judgment attachment pending resolution of this motion and the preliminary injunction hearing. In support thereof, Mr. Simpson states as follows:

---

## NOTICE OF APPEARANCE

1. I, David Simpson, hereby enter my appearance in the above-captioned action on my own behalf, pro se, under 28 U.S.C. § 1654. I appear solely on my own behalf; I do not seek to represent, and am not qualified to represent, any other person.

2. I am a victim of the investment fraud scheme that is the subject of this action. I am not a party to the Joint Prosecution and Common Interest Agreement dated July 7, 2026 (the "JPCIA"). I am not a member of the Steering Committee, and I have never been served with process or given formal notice of this action.

3. Because the matters at issue are complex and the time to respond is short, I appear today pro se solely to preserve my rights and to place myself before the Court, and I state my present intention to retain counsel of my own choosing within the next seven to fourteen (7–14) days (see Part VI below).

---

## I. THE OUTRAGE - WHY I MUST INTERVENE

4. I address one matter at the outset, because I expect the defendants to raise it. I am not a promoter of the Manhattan ST Notes or of any related product, and I never received any commission, referral fee, or other compensation for marketing or selling these products. I was a net loser. I lost approximately USD 483,000 to the Manhattan ST Notes fraud. That figure is not abstract. It represents years of savings, retirement funds, and the financial security of a real person who was deceived by people he trusted. In the Madoff case, SIPA Trustee Irving Picard recovered more than $14 billion for defrauded investors — ultimately about 75 cents on the dollar — precisely by suing the intermediaries, feeder funds, and "net winners" who had profited, and clawing those funds back into the victim recovery fund. The lesson of Madoff is that intermediaries who profit from a fraud must be made to disgorge what they took — not to be paid first out of the recovery. The JPCIA here inverts that principle by listing the very intermediaries who recruited me as "Released Distribution Participants" who may share in the frozen assets ahead of the victims. That is the outcome I ask the Court to prevent.

5. The intermediaries who recruited me into this scheme — Annette M. Houlihan and her advisory firm Carey Suen, and CGW — are not victims. They are the distribution channel that made this fraud possible. They were paid commissions to recruit real people into a Ponzi scheme. They marketed sham products as "principal-protected" — words representing that the investor's principal was not at risk of loss — a representation that was false. If any distribution is made from the frozen assets without my claim being adjudicated first, those unlicensed promoters will be paid from the very money they

helped steal. That is the outcome I am here to prevent. The inducement was not the promise of high returns alone; it was the representation that my principal was safe. In a recorded webinar circulated to me, my intermediary represented that my "capital stays 100% protected while compounding quarterly." A product framework document described a "Multi-Tier Capital Protection (MTCP)" architecture backed by a "Gipfel Capital Reserve," and a Black Label program brochure promised "100% Principal Delivered Under MTPP." Those marketing materials are attached as Exhibit I. None of that protection was ever real, and none of the intermediaries ever disclosed that they were being paid to steer me into an unregistered and collapsing scheme.

6. That outcome is not hypothetical. In the Madoff case, the SIPA Trustee recovered billions by suing the feeder funds and promoters who had steered victims into the scheme, and returned those funds to the victims. The law recognizes that intermediaries who profit from fraud cannot be allowed to keep those profits at the expense of the people who were defrauded. Yet the JPCIA here appears to do the opposite: it lists the intermediaries who recruited me as "Released Distribution Participants" who may share in the recovery ahead of the victims who lost money. I am not a party to the JPCIA and I do not consent to be bound by it.

7. The Steering Committee, the JPCIA parties, and the intermediaries now ask this Court to keep the TRO in place - but they have not asked for my consent, have not disclosed my claim, and have not explained why intermediaries who recruited victims into a Ponzi scheme should receive any distribution at all. I intervene as of right under Rule 24(a)(2) and, in the alternative, permissively under Rule 24(b)(1)(B). I also move for interim relief to preserve the status quo.

8. I give notice that, should intervention be granted, I intend to seek additional relief from this Court, including but not limited to: (a) the unsealing of ECF Nos. 48, 50, and 52; (b) the appointment of a neutral receiver under Rule 66; (c) the equitable subordination of the Steering Committee's and the Approved Distribution Participants' claims; and (d) the preservation of my independent claims, including my claim for treble damages under 18 U.S.C. § 1964(c). Those matters are described further at Part IX below.

---

## II. FACTUAL BACKGROUND

### A. The Scheme

9. The "Manhattan ST Notes" were not legitimate investment products. They were unregistered securities marketed by unlicensed promoters in violation of federal and state securities laws. They promised returns of approximately 10%–14% over 120–145 days and were marketed as "principal-protected" — representations that were false. The same unlicensed promoters who marketed these sham products now stand to be paid first from the frozen assets. That is a miscarriage of justice.

10. This scheme is not an isolated event. It is the latest iteration of a pattern of serial fraud by the same band of unlicensed promoters, involving the same methodology: marketing sham investment products as "principal-protected" through unregistered intermediaries,

collecting investor funds, and then restructuring or dissolving when investors demanded answers. The same individuals and methods recur across more than two decades of publicly reported schemes: the Bangkok boiler room (Brinton Group; arrest in 2000, conviction in 2004); Centaur Litigation (Cayman), which collapsed in 2014 owing investors approximately $130 million; Kirribilli (UK, c. 2015–2020); Allotz.com Limited (Australia, in liquidation since 2022); and SurgeTech / Surge Pricing Patent Holdings (US, from 2021). These are matters of public record. See, e.g., ABC News (Australia), "Fraudster resurfaces as part of legal dispute over surge pricing patents" (13 Feb. 2025); UK Companies House records for Kirribilli Investment Limited (No. 09583868); and the Cayman liquidation proceedings for the Centaur funds. And now the Manhattan scheme. This is not negligence. This is a business model. A schedule of the cash I invested is attached as Exhibit G.

11. Beginning in or about May 2025 and continuing through 2026, I transferred approximately USD 483,000 in multiple wire payments. Every transfer was made in reliance on the defendants' fraudulent representations and material omissions. I was not making an investment. I was being defrauded by a coordinated enterprise of promoters, intermediaries, and financial institutions that understood or should have understood that the product they were selling had no genuine market, no audited financials, and no independent valuation. I have requested my complete bank and wire records from the financial institutions involved; those records are voluminous and are still being assembled. I attach representative screenshots of a few of the transfers (see Exhibit A), which show the form, direction, and destination of the payments. The transfers were made in installments — USD 50,000, USD 20,000, USD 200,000, and USD 145,000, totaling approximately USD 415,000, together with GBP 51,500 — for a total of approximately USD 483,000 (the GBP amount converted at an assumed rate of approximately USD 1.32 per GBP; GBP 51,500 × 1.32 ≈ USD 68,000). What induced me to invest was not the prospect of high returns — though, like any investor, I welcomed them — but the representation that my principal was protected and that my money was not at risk of loss. That representation was false. I will supplement the record with the full bank records as they are produced.

12. I was recruited by Annette M. Houlihan, an unlicensed intermediary who presented herself as a trusted financial professional and who marketed the products through her advisory firm, Carey Suen. She sold me the Woodville, Peninsula, and other Manhattan ST Notes products. She was compensated for my investment. She was not acting in my interest. She was acting as a paid distribution channel for a Ponzi scheme. One of the products she sold me, Woodville Consultants Limited, has since collapsed into receivership, and my investment of approximately GBP 10,000 in that product is lost as well. When I later raised concerns, she offered reassurances, not warnings — because warning me would have stopped her commissions. Her written solicitation was explicit: she described these opportunities as "specifically designed to provide capital guarantees alongside short-term, high-yield returns," called them "secure, well-structured, and transparent investment options" for clients "approaching retirement or already retired," and urged me to share this "capital-protected, steady, and reliable income opportunity" with friends and colleagues. (Exhibit D.)

13. My account was administered by Consult Group Worldwide Ltd ("CGW") (UK company no. 9566121) through the Carey Suen advisory practice and its principal, Annette M. Houlihan. Every intermediary in this chain — CGW, Carey Suen, and Annette M. Houlihan — was paid from my investment. They are now Listed on the JPCIA Released Distribution Participant Schedule, meaning they stand to be paid from the frozen assets before any victim receives a cent. The unlicensed promoters who marketed a sham product are first in line for the recovery. The victims are not. CGW itself confirmed my investment in writing: on 18 February 2025, CGW's Head of Global Operations, Madli Pihel, emailed the Welcome Pack for "Mr David Simpson — Investment amount: £10,000 (GBP) — Investment term: 12 months @ 8%," thanked my intermediary for "his investment into the Woodville Loan Note," and directed that I sign and return the Loan Note. (Exhibit E.)

14. My subscription agreements (Exhibit B) name the issuer as Manhattan ST Notes, LLC (Manhattan 5 Oceans Partners Platform), which is a named defendant in this action. The agreements direct that subscriptions be delivered to Manhattan ST Notes, LLC, and state that the investor "authorize[s] Manhattan ST Notes, LLC to process your instructions."

15. Beyond a single coupon payment of approximately USD 1,600 and a single principal repayment of approximately USD 20,000, my funds were not returned; I received no other net distributions of principal or returns. Instead, I was induced to "roll over" 100% of my maturing principal and accrued coupons into new products through a series of Maturity Rollover and Options Deeds (Exhibit C). This rollover mechanism prevented cash-out, compounded my exposure, and created the false appearance of performance — the hallmarks of a Ponzi-style structure.

### C. The Temporary Restraining Order and the Absence of Notice

16. On or about September 3, 2026, this Court entered a Temporary Restraining Order ("TRO") and pre-judgment attachment freezing assets of the defendant entities.

17. On or about September 23, 2026, the TRO/attachment was extended to cover approximately GBP 9,148,525.50 held at Mosaic Global Capital UK Fund LP (a non-party fund).

18. The TRO/attachment is scheduled to expire on or about October 1, 2026.

19. I was never served with process and was never given formal notice of this action as a party. I was not contacted by the Steering Committee's counsel (Neal H. Levin, Esq., Rimon P.C.) through any official channel. To be clear, the Steering Committee's intermediary, Annette M. Houlihan, did approach me about joining the Committee on several occasions (as described in paragraph 23 below); that informal approach is not, and is not the equivalent of, service or formal notice. I first learned of this action, of the frozen Mosaic Global Capital UK Fund LP funds, and of the potential compromise of the recovered assets only on the evening of Sunday, September 27, 2026 — and not through any official channel. I have moved promptly thereafter to protect my rights.

## D. The Steering Committee

20. The Steering Committee is the named plaintiff in this action. It purports to represent the victims of the ST Notes fraud.

21. The Steering Committee is composed in significant part of Approved Distribution Participants — the intermediaries who recruited victims, earned commissions and referral fees, and controlled the flow of investments into the scheme.

22. Under the JPCIA, the Steering Committee controls settlement, release, and distribution allocation (Clause 7.1), and the "Approved Funding Agent" mechanism (Clauses 2 and 10.14) may afford preferential treatment to those who funded the litigation — including the very intermediaries who recruited the victims.

23. I am not a party to the JPCIA. I am not a member of the Steering Committee. I was not represented by its counsel. I have not agreed to any settlement, release, waiver, or distribution. The Steering Committee, through its intermediary Annette M. Houlihan, has nevertheless approached me on numerous occasions seeking to have me join the Steering Committee. Joining would require me to release and waive my claims against the members of the Committee — the very intermediaries who recruited me into the scheme. The Committee sent me a copy of the JPCIA itself in an effort to obtain my agreement to it; I retain that copy, have reviewed it, and chose not to participate in the collective action. Conditioning participation on a full release of the intermediaries makes plain that my interests and the Committee's interests are not aligned. In fact, they are not only not aligned; they are adverse to mine. My best route to recovery is exactly the route that they foreclose. The intermediaries' incentives are likewise adverse. In an agents' briefing chat inadvertently seen by me (Exhibit F), the advisors coordinating the claims process compared their claimant counts ("I have 340 claimants"; "Me too (339)") and the pressure to move clients quickly ("one client feels 'rushed' but I will calm him down"), and noted that "the files are going to the lawyers now." Their objective appears to be to enroll as many claimants as possible and have them waive their claims against the Committee's members. That is precisely the conflict that makes their representation of me inadequate.

---

## III. THIS MOTION IS TIMELY

24. Under Rule 24, intervention must be sought "timely" upon my learning of the action and of the interest at stake.

25. My application is timely because:

(a) I first learned of this action, of the frozen Mosaic Global Capital UK Fund LP funds, and of the potential compromise of the recovered assets only on the evening of Sunday, September 27, 2026, and not through any official channel;

(b) The TRO is set to expire on or about October 1, 2026, and a preliminary injunction hearing is expected thereafter;

(c) If I am not permitted to intervene now, the Court may rule on the preservation and distribution of the recovered assets before I can be heard; and

(d) I filed this motion at the earliest practicable time after learning of the action.

---

## IV. I HAVE STANDING AND AN INDEPENDENT CLAIM

26. I have standing because (a) I suffered a concrete injury in fact — the loss of approximately USD 483,000 of my personal funds to a fraudulent investment scheme; (b) that injury is fairly traceable to the conduct of the defendants, the intermediaries who recruited me, and the enabling financial institutions; and (c) a favorable decision is likely to redress my injury.

27. My independent claims arise from the same pattern of racketeering activity that is the subject of this action. I intend to plead claims including: (i) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and (d), based on predicate acts of wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), and securities fraud (15 U.S.C. § 78j(b) and 18 U.S.C. § 1348), committed by an enterprise consisting of the Manhattan ST Notes promoters, their unlicensed intermediaries, and their enabling financial institutions; (ii) common law fraud and negligent misrepresentation; (iii) conversion; (iv) unjust enrichment; (v) aiding and abetting fraud under New York law; and (vi) violations of state securities laws. The enterprise operated through the same pattern: marketing sham "principal-protected" investment products through unregistered intermediaries, collecting investor funds, and dissolving or restructuring when investors demanded answers.

28. I also hold independent claims that do not depend upon the Steering Committee. These include (a) aiding and abetting fraud against Annette M. Houlihan, her firm Carey Suen, and CGW; and (b) a claim to trace my funds into the frozen res and to impose a constructive trust and equitable lien over the approximately GBP 9,148,525.50 held at Mosaic Global Capital UK Fund LP. My tracing claim does not rest on the fund's pooled LP capital; it rests on the path of my own subscription monies, which were wired into the Manhattan ST Notes, LLC account at BMO Bank N.A. (Chicago; routing 071000288) and passed through Manhattan Private Credit Markets LLC in New York before reaching the Mosaic fund, the proceeds of which this Court has already attached. I plead tracing and knowing receipt. Because that res is held by Mosaic Global Capital UK Fund LP — which was not previously a party to this action — I also seek to join Mosaic as a party so that any constructive trust or equitable lien can be enforced against the res. I am candid with the Court that this tracing strand is my weakest: it depends in part on bank and fund records I have requested but do not yet hold, and I plead it subject to that qualification.

29. These are my own claims, arising from my own transaction, and they may be impaired or extinguished if this action proceeds to settlement, release, or distribution without me.

---

## V. INTERVENTION SHOULD BE GRANTED

30. Permissive intervention (Rule 24(b)). I have a claim or defense that shares with the main action a common question of law or fact — namely, whether the defendants operated the fraudulent scheme, whether the intermediaries facilitated it, and how the recovered assets should be distributed. My intervention will not unduly delay or prejudice the adjudication of the original parties' rights. The Court should permit intervention under Rule 24(b).

31. Intervention as of right (Rule 24(a)(2)). In the alternative, I am entitled to intervene as of right because (a) I claim an interest relating to the property or transaction that is the subject of this action — the recovered assets in which I have a direct stake; (b) the disposition of this action may as a practical matter impair or impede my ability to protect that interest; and (c) my interest is not adequately represented by the existing parties.

32. My interest is not adequately represented. The Steering Committee is aligned with the very intermediaries whose interests are adverse to mine; its counsel does not represent my independent claims; and Clause 7.1 of the JPCIA permits the Committee to settle, release, and allocate distributions without my consent or notice. Because I am not a party to the JPCIA and have not consented, the Committee can neither represent nor bind me. See Taylor v. Sturgell, 553 U.S. 880 (2008) (a nonparty is not bound by a judgment absent consent, privity, or adequate representation). Indeed, the Committee has solicited my membership only on the condition that I waive my claims against its own members — the intermediaries who recruited me. A representative that requires me to release my claims against it cannot adequately represent me.

---

## VI. I INTEND TO RETAIN COUNSEL WITHIN 7–14 DAYS AND REQUEST A CORRESPONDING ENLARGEMENT OF TIME

33. I appear today pro se because this is a complicated, multi-party, multi-jurisdictional matter involving a receivership question, sealed filings, complex distribution mechanics, and independent statutory claims. I am not a lawyer.

34. I represent to the Court that I intend to retain counsel of my own choosing to represent me in this action, and require seven to fourteen (7–14) days to do so, given that I only learned of this action and of the frozen Mosaic funds on the evening of Sunday, September 27, 2026.

35. I do not seek to delay the case. I seek only the brief time genuinely required to obtain representation, while preserving my rights in the interim. To that end, I respectfully request that the Court:

(a) accept this pro se appearance and this motion;

(b) grant a fourteen (14)-day enlargement of time for me to obtain counsel and, if the Court permits, to appear through counsel; and

(c) provide that any response or opposition to the substantive relief described in Part IX shall be due after that enlargement, so that the matter may be presented by counsel.

---

## VII. I HAVE FILED A PROPOSED COMPLAINT IN INTERVENTION (RULE 24(c))

36. In compliance with Rule 24(c), I submit with this motion a complete proposed Complaint in Intervention setting forth the claims for which I seek to intervene (attached as Attachment 1 and filed herewith). I do not request any further leave to file it later; the proposed Complaint is filed with this motion, subject to the Court granting leave to intervene.

37. If the Court grants leave to intervene, I may seek leave to amend the attached proposed Complaint in Intervention through counsel once counsel is retained, so that my claims — and in particular my claim under the Racketeer Influenced and Corrupt Organizations Act — are pleaded with the particularity the law requires. I do not, however, condition intervention on that future step, and I ask the Court to accept the attached proposed Complaint as filed.

38. The claims pleaded in the attached proposed Complaint in Intervention are set forth in Part IV above and summarized in Part IX below.

---

## VIII. INTERIM RELIEF — THE COURT SHOULD PRESERVE THE STATUS QUO AND NOT DISSOLVE THE EXISTING TRO

39. The existing TRO and pre-judgment attachment are scheduled to expire on or about October 1, 2026. If that protection lapses before a receiver is appointed or before I can be heard, the preserved assets — including the approximately GBP 9,148,525.50 held at the Mosaic Global Capital UK Fund LP — may be dissipated, returned to wrongdoers, or otherwise unavailable for distribution to victims.

40. I do not seek a new or expanded restraining order, and therefore do not ask the Court to alter the notice obligations applicable to new injunctive relief. I ask only that the Court preserve the status quo by permitting the existing TRO and attachment to remain in effect — and by refraining from dissolving them — pending the preliminary injunction hearing and the resolution of this motion.

41. I further request expedited consideration of this motion in light of the October 1, 2026 expiry of the TRO, so that the protections now in place are not lost through the passage of time.

---

## IX. THE ATTACHED PROPOSED COMPLAINT IN INTERVENTION — THE PONZI SCHEME PATTERN

The Manhattan ST Notes scheme follows a template as old as fraud itself. In 1920, Charles Ponzi promised investors a 50% return in 45 days through international postal reply coupons. The scheme collapsed when the influx of new money stopped. In 2008, Bernard Madoff promised consistent, modest returns through a phantom split-strike conversion strategy. That scheme collapsed when investors tried to withdraw. In each case, the scheme depended on a constant

flow of new investor money. And in each, the promoters and the intermediaries who steered victims in — not the victims — held the upper hand in any recovery. The Manhattan ST Notes scheme follows the same pattern: promise principal-protected returns of 10–14% through unlicensed intermediaries, recruit new investors to pay earlier ones, and dissolve the entity when the money runs out. The only thing that changed was the marketing material.

42. I disclose, so that the Court and all parties are on notice, that if intervention is granted I intend to seek the following relief:

(a) Unsealing — an order unsealing ECF Nos. 48, 50, and 52 (the Levin Affidavit and exhibits), so that non-party victims can understand the full scope of the fraud;

(b) A declaration — that the Manhattan ST Notes scheme constitutes a Ponzi scheme within the meaning of securities law, following the pattern identified in SEC v. Madoff (S.D.N.Y. 2008), SEC v. Stanford International Bank (N.D. Tex. 2009), and In re Bernard L. Madoff Investment Securities LLC (In re SIPA Proceedings);

(c) Intermediary liability — a determination that the intermediaries who recruited investors, collected commissions, and distributed the sham product are liable as aiders and abettors and must disgorge all commissions received;

(d) Appointment of a receiver — an order under Federal Rule of Civil Procedure 66 appointing a neutral receiver to preserve the recovered assets (including the GBP 9,148,525.50 at the Mosaic Fund), administer a claims process with a bar date, and distribute the assets equitably to all valid claimants — not merely to JPCIA parties;

(e) Equitable subordination — an order subordinating the collective claims of the Steering Committee and of the Approved Distribution Participants who recruited victims and enriched themselves through commissions and referral fees;

(f) Preservation of independent claims — an order confirming that I am not bound by any release, waiver, settlement, or distribution provision of the JPCIA to which I am not a party; and

(g) Prosecution of my independent claims — prosecution of the attached proposed Complaint in Intervention setting forth my independent claims, including my claim for treble damages under 18 U.S.C. § 1964(c), as described in Part VII above.

43. I do not ask the Court to decide those matters today. I ask only that I be permitted into the case, with sufficient time to obtain counsel, so that those matters may be presented properly and ruled upon before the recovered assets are distributed.

## EXHIBITS

In support of this motion, I submit the following exhibits: Exhibit A — HSBC wire transfer(s) to Manhattan ST Notes, LLC, including representative transfer screenshots; Exhibit B — my subscription agreement (ELITE Series Gold, 20 May 2025); Exhibit C — my rollover option deed; Exhibit D — recruitment correspondence from Annette M. Houlihan of Carey Suen describing the investment as capital-protected; Exhibit E — the investment confirmation from Consult Group Worldwide Ltd (CGW); Exhibit F — an agents' briefing chat (inadvertently seen) showing claimant-count tracking and pressure to enroll clients; Exhibit G — a schedule of the

cash I invested (USD 415,000 in transfers plus GBP 51,500, aggregating approximately USD 483,000); Exhibit H — the Know-Your-Customer (KYC) confirmation issued by CGW through Madli Pihel; Exhibit I — principal-protection marketing materials I received from my intermediary (a webinar and product brochures representing that my principal was 100% protected); and Exhibit J — a screenshot of my Manhattan investor portal (gateway.manhattanpcm.com) showing the total invested of USD 483,708.

---

Dated: New York, New York September 29, 2026

Respectfully submitted,



David Simpson
Proposed Plaintiff-Intervenor, Pro Se
Residential address: *filed under seal*
Telephone: *filed under seal*
Email: armourholdings@outlook.com

For my personal safety, I will move separately for leave to file my residential address and telephone number under seal.

---